Filed 9/30/21 Certified for Publication 10/28/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID ZAMORA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SECURITY INDUSTRY SPECIALISTS,<br>INC.,<br><br>    Defendant and Respondent. | H044008<br>(Santa Clara County<br>Super. Ct. No. 12CV233674) |

David Zamora sued his former employer, Security Industry Specialists, Inc. (SIS), under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] for employment discrimination based on physical disability, failure to make a reasonable accommodation, failure to engage in the interactive process, retaliation, wrongful termination, and other claims after SIS laid him off while he was recovering from an industrial injury. The trial court granted summary adjudication of all but two causes of action. The parties later stipulated to dismiss the remaining claims, and the court entered judgment for SIS.

In this appeal, Zamora challenges the trial court's summary adjudication of his disability discrimination, retaliation, wrongful termination in violation of FEHA, and

---

[1] Undesignated statutory references are to the Government Code.

wrongful termination in violation of public policy claims. Our de novo review of the record demonstrates that summary adjudication was improperly granted with respect to Zamora's disability discrimination and wrongful termination claims, but that summary adjudication in favor of SIS was appropriate with respect to Zamora's retaliation claim. We will therefore reverse the judgment and remand the matter for further proceedings in the trial court.

## I. FACTS

At all relevant times, SIS provided security staffing services to major corporations, including Apple Computer, Inc. (Apple) and other technology companies. SIS hired Zamora as a "standard deployment field supervisor" assigned to Apple's main campus in Cupertino, California. He started on May 26, 2010. His duties included supervising mobile officers and security specialists on his shift, responding to security calls and client requests, conducting shift briefing meetings, evaluating and administering discipline to subordinates, driving, and providing "security for top-level employees." Zamora testified that the physical requirements of the job included walking four to six hours per day, standing seven hours a day, climbing (including onto the roof), stooping, bending, kneeling, and lifting up to 50 pounds.

SIS employed 19 supervisors at Zamora's worksite. The supervisors reported to watch commanders, and according to Zamora, there were three watch commanders, one for each shift. The watch commanders in turn reported to the site manager, Marty Vaughn.

On June 2, 2010—eight days after he was hired—while running to answer a medical call with four coworkers, Zamora tripped over a curb, twisted his left knee, heard a loud popping noise, and "immediately experienced severe pain in his left knee." Zamora claims his supervisor, Watch Commander Jim Mazon, witnessed the incident. Zamora told Mazon he was having pain in his left knee, and Mazon suggested he ice the

2

knee and elevate it when he got home. Mazon did not report the injury to SIS as required by company policy or instruct Zamora to report the injury.

Zamora iced and elevated his left knee as Mazon suggested and used a knee brace. Despite having "very intense knee pain," Zamora continued to work every day from June 2, 2010, until November 17, 2010. Zamora testified that during this time, he mentioned his knee pain numerous times to both his coworkers and his superiors.

After Zamora completed a probationary period, he became eligible for health insurance benefits from SIS. Zamora waited until he had health insurance to seek medical treatment for his knee injury. On October 14, 2010, he saw Dr. Douglas Blatz, an orthopedic surgeon. He told Dr. Blatz the injury was work-related and, according to Zamora, that started the workers' compensation claim process. Dr. Blatz diagnosed a torn meniscus and medial shelf plica and told Zamora he needed arthroscopic surgery on his left knee.

After seeing Dr. Blatz, Zamora formally reported the injury to SIS. On October 15, 2010, he gave site manager Vaughn a written report from Dr. Blatz. Vaughn instructed Zamora to fill out an SIS incident report and a Workers' Compensation Claim Form (Dept. of Industrial Relations form DWC-1) and asked watch commander Robert Freeman to help Zamora with the forms. SIS terminated Mazon a few days later for multiple reasons, including his failure to report Zamora's injury.

Zamora claims that on more than one occasion between mid-October and mid-November 2010, he asked Mazon or Vaughn for work that involved less standing and physical activity, consistent with his work restrictions. Zamora was having severe left knee pain and thought that performing such work would decrease his pain and allow him to continue working. He alleges that both Mazon and Vaughn told him there was no other work for him to do and that SIS's failure to provide modified work in 2010 aggravated his knee injury.

3

On October 29, 2010, Zamora was seen by Dr. Mojan Manzar-Nejad at Alliance Occupational Medicine (Alliance). The record suggests he was referred there by SIS. Zamora gave a history of the knee injury in June 2010. He told Dr. Manzar-Nejad that although he was able to perform his regular job, he could no longer control his pain with ibuprofen and asked for Vicodin. He also told the doctor that he injured the same knee in 2007, with injuries to his meniscus and anterior cruciate ligament resulting in arthroscopic surgery, and that he had been "fine" ever since. Dr. Manzar-Nejad noted positive findings in the left knee on examination and that Dr. Blatz had obtained an MRI that was positive for "full-thickness cartilage defect" and revealed the prior injury and surgery. Dr. Manzar-Nejad diagnosed internal derangement of the left knee with abnormal findings on the MRI. He opined that an orthopedic consultation was necessary to determine whether Zamora's complaints were due to a new injury or his old injury and whether they were industrial. Dr. Manzar-Nejad prescribed a soft knee splint, cold packs, and pain medication; released Zamora to return to full duty; referred him to clinic orthopedist Dr. Samir Sharma; and told Zamora to return in three weeks or sooner if his condition worsened.

On November 17, 2010, Zamora stopped working because he could not tolerate the pain any longer. That day, he saw Dr. Anthony Dubose at Alliance, complained of pain, and reported that overall, his condition was worse. Dr. Dubose took him off work; arranged for him to be seen by Dr. Sharma the following day; and reported that Zamora could return to work the following day on modified duties: "Mostly Seated Work," "Elevate Affected Extremity," "Sit/Stand As Needed," and no lifting, pulling, or pushing over five pounds. Dr. Dubose estimated that Zamora would need modified work for two months.

The record does not contain a medical report of Zamora's consultation with Dr. Sharma on November 18, 2010. Thus, we do not know whether the orthopedist

4

agreed with or changed Dr. Dubose's work restrictions. According to Zamora, Dr. Sharma gave him a cortisone injection and recommended six weeks of physical therapy. Zamora thought his condition was more serious, requested a second opinion, and was referred to an orthopedic surgeon, Dr. Ashay Kale.

Zamora saw Dr. Kale on December 2, 2010. Dr. Kale noted that Zamora had significant pain and swelling in the knee and confirmed that he needed surgery. Zamora told Dr. Kale he could not perform his regular work duties, so the doctor recommended that he get authorization for surgery—presumably from the workers' compensation insurer—and that he remain off work until the surgery was done.

Given the delay in formally reporting the claim, and the report of a prior injury to the same knee, SIS's workers' compensation carrier, California Insurance Company— through its claims administrator Applied Underwriters (hereafter jointly Insurer)— questioned whether the injury occurred at work and initiated an investigation. As part of its investigation, Insurer arranged for Zamora to be seen by a "qualified medical evaluator,"[2] Dr. Edwin Kingsley, who presumably opined on the question of industrial causation. (Dr. Kingsley's report is not in the record.)

Insurer withheld payment of temporary disability benefits while it investigated the claim. From mid-November 2010 until mid-March 2011—while Insurer investigated the claim—SIS continued to pay Zamora his full salary. According to SIS, this was not its customary practice, but it made an exception in Zamora's case. Insurer accepted the claim in February or March 2011. On March 17, 2011, Insurer issued its first temporary

---

[2] A "qualified medical evaluator" is a licensed physician who has been appointed by the administrative director of the Division of Workers' Compensation of the California Department of Industrial Relations to evaluate medical-legal issues arising under the workers' compensation laws, including disputes regarding industrial causation and the compensability of any injury. (Cal. Code Regs., tit. 8, § 1, subd. (z); Lab. Code, §§ 139.2, 4060, 4062.1.)

disability payment to Zamora covering the period March 1 through March 17, 2011. After that, Insurer made biweekly temporary disability payments to Zamora through November 8, 2012.

On March 25, 2011, SIS sent Zamora a check for $2,166.67 covering his salary for the period March 1 through March 15, 2011, the same period for which Insurer had already paid temporary disability. SIS initially asserted that the duplicate payment (hereafter overpayment) was due to a misrepresentation by Zamora to Insurer regarding the last day he was paid by SIS. But after investigating the matter, SIS determined that Zamora did not misrepresent the date he was last paid by SIS and that the overpayment was due to an error by SIS's human resources manager, Michelle Ortiz, who failed to notify payroll to stop the salary continuance payments.

Thomas Seltz was SIS's co-president, chief financial officer, and general counsel. In April 2011, Seltz learned that Zamora had applied for a job at one of SIS's new client sites. Seltz thought it was wrong for Zamora to be doubly compensated for his temporary disability. He told Vaughn about the overpayment and said that before SIS would offer Zamora a job at the new site, he would have to return the money. Seltz believed that was the right thing for a supervisor like Zamora to do. He told Vaughn that Zamora would be "disrespecting" the company if he did not pay the money back and asked Vaughn to call Zamora and request reimbursement. Vaughn called Zamora and asked him to return the money that SIS had overpaid.[3] According to Vaughn, Zamora said he had gone through months of pain, was struggling financially, and could not afford to reimburse the company. Vaughn told Seltz that Zamora was thinking about reimbursing the company. Zamora disputed these facts. He declared that "Vaughn did not mention that there was a

---

[3] SIS never asked Zamora to return the $15,166.69 it had paid as salary continuance prior to March 1, 2011. It sought reimbursement of only the $2,166.67 it paid after Insurer started paying temporary disability.

double payment" and claimed that no one at SIS ever asked him to return the money. Zamora never reimbursed SIS for the overpayment.

While on disability, Zamora kept Vaughn and SIS human resources apprised of his disability status and updated them every time he went to a doctor. Zamora recalled speaking with Vaughn three times between December 2010 and May 2011. Although his doctor had not released him to return to work yet, on each of those occasions, Vaughn reassured him that there would be a job for him as soon as he was released to return to work. At one point, Vaughn told him he would be getting another position that would be "scaled down" and "more of an inside . . . sitting down type of position."

Dr. Kale performed arthroscopic surgery on Zamora's left knee on May 18, 2011, and saw him in follow-up on May 31, 2011. SIS considered Zamora's return to work at that time. On June 1, 2011, Vaughn stated in an e-mail to Dave Harville, the vice president of operations at SIS, that if Zamora returned to work, he would have to try and find a position for him and that he did not know if he had a "Supervisor position available." Vaughn also asked: "If we termed him, would he still have to pay back the amount?"

On June 24, 2011, Insurer sent Dr. Kale a letter asking whether Zamora might be able to return to modified duties and asked him to fill out a form setting forth Zamora's work restrictions. Dr. Kale responded on June 29, 2011, and reported that, based on his May 31 exam, Zamora could return to modified work and do the following tasks: keyboarding, operating cash, supervising others that perform physical tasks, driving, and sitting for up to eight hours. He could stand for two hours at a time, walk for one hour, but could not do any climbing.

After receiving Dr. Kale's report, SIS human resources manager Ortiz and Vaughn proposed a "temporary, modified work" position for Zamora as an administrative supervisor, which appears to have been consistent with Dr. Kale's restrictions, at the

7

same salary as before. They also proposed training him for the position. Since it was not clear whether Zamora knew that Dr. Kale had released him to modified work, Ortiz suggested sending Zamora a letter and asked for management input on the contents of the letter. In an e-mail dated July 13, 2011, Harville said that the letter should advise Zamora that his return to work "is contingent upon repayment" of the overpayment and suggested that SIS should "be prepared to separate him if he chooses not to accept the return to work [*sic*] agreement." Ortiz responded that the company could not terminate him for rejecting modified work "because he is still on workers' compensation." She did not think SIS "should terminate him until workers' compensation clears him from his claim" and recommended SIS reevaluate the terms of his employment after the claim is closed.

On July 14, 2011, Ortiz prepared a draft letter to Zamora, which described the modified work offer, including the duties of the position. The draft letter stated that "in order to reinstate" his employment, Zamora would have to pay back the overpayment and suggested he could pay the money back over time with "deductions" from his paycheck. Ortiz sent the draft letter to Jeff Venturini, a senior human resources manager, and asked for his input. On July 21, 2011, Ortiz sent Venturini an e-mail stating, "I know I have been asking you every day now but did you get to that David Zamora letter?" The record does not contain a response to Ortiz's e-mail or explain what happened with the proposal to offer Zamora modified work as an administrative supervisor.

When Zamora saw Dr. Kale on July 27, 2011, he complained of stiffness and popping in the knee. Since it had been only two months since the surgery, and Zamora was not able to fully flex or straighten the knee, Dr. Kale thought more time off to recover and exercise would be beneficial. He was also concerned that Zamora might aggravate his pain and hinder his recovery by going back to work too early. Dr. Kale therefore authorized him to remain off work another six weeks—until September 11, 2011—at which time the doctor hoped to release him to modified duty.

8

In August or September 2011, Apple told SIS that it planned to cut its budget for SIS's services by $7 million in 2012. This affected all of SIS's Apple worksites and prompted a reduction in force of approximately 10 percent. SIS eventually laid off 48 employees nationwide, including 14 employees at the site where Zamora worked. The reduction in force affected four of the 19 supervisory positions at that site. After SIS determined that it would have to lay off four supervisors, Vaughn worked with human resources and senior management to develop merit-based criteria to evaluate the supervisors to determine who would be laid off. Vaugh and four watch commanders later evaluated the supervisors on a scale of zero to five in seven categories: customer service, performance, critical thinking, communication, initiative, tenure, and availability. Zamora ranked 16th of the 19 supervisors, and since he was among the four lowest-rated supervisors, his position was selected for the lay-off. According to Vaughn, the evaluators understood that they could not consider Zamora's disability or workers' compensation claim and gave him a "high score" of four for availability. Zamora received a low score for communication because he occasionally tried to handle security matters on his own when he should have involved his superiors. After the reduction in force, the supervisors who remained at the site absorbed Zamora's duties.

Dr. Kale saw Zamora on September 12, 2011, and released him to return to modified work beginning October 3, 2011, with the following restrictions: no kneeling, bending, or squatting, and no night shift work.

In September 2011, Seltz learned that Zamora had been selected for the lay-off and told SIS recruiter Ted Bianchi, whose duties included recruiting new employees and recommending existing employees for open positions, that Zamora could be "rehired" as long as he reimbursed the company for the overpayment. Zamora alleged Seltz also told Bianchi that Zamora was "disrespecting the company" by failing to return the overpayment. Although SIS management continued to complain about the overpayment

9

until Zamora was laid off, there is no evidence SIS ever sent Zamora an accounting or a written demand to reimburse the overpayment or tried to work out a repayment plan with him.

On September 29, 2011, SIS sent Zamora a letter advising him of the reduction in force and that he would be laid off on October 10, 2011. The letter stated that "this decision was not prompted by" or "in any way related to" his performance and that he would therefore be eligible for unemployment benefits. The letter said SIS would be working hard to identify new clients and suggested Zamora "periodically check in" with one of its recruiters.

Zamora saw Dr. Kale on September 30, 2011, and complained of increased pain in his left knee after a fall. Dr. Kale concluded that he was not able to return to work as planned, rescinded the previous release to modified work, and extended his temporary disability for two weeks.

After SIS eliminated the four supervisory positions as part of the reduction in force, it found other positions for two of the supervisors (Murillo and Lopez) who had ranked lower than Zamora in its evaluation process. Rather than lay them off, SIS retained them, but demoted them to patrol officers. Thus, only two of the four lowest-ranked supervisors (Zamora and one other) were laid off in the reduction in force, along with 12 other employees at the Cupertino site.

Although SIS notified Zamora on September 29, 2011, that he had been selected for the lay-off, there is some evidence that it continued to look for another position for him after that date. On September 30, 2011, Seltz sent an e-mail to SIS recruiter Bianchi stating: "Assuming he is cleared to be rehired somewhere, the below is the amount he needs to pay back." On October 1, 2011, Harville sent an e-mail to Vaughn and others stating that SIS needed a driver for eBay, "someone that can drive[] the CFO around for the rest of the year." Someone forwarded the e-mail to Bianchi, who suggested Zamora

10

and one other employee. He said Zamora "would be great," the job "might be a good fit," and he "could have both ready to interview on [M]onday." The record does not reveal what happened with the driver position at eBay.

On October 13, 2011, SIS sent Zamora a letter stating that management had been trying to contact him by phone to discuss his employment status for two days and had left three messages to which Zamora had not responded. The letter stated that "[d]ue to [his] lack of attendance and no correspondence," SIS was "sending this notification to inform" him that "due to the restructuring of the security program, [SIS had] been forced to cut certain positions" and that his position had been "impacted by these cuts." The letter stated that he still possessed "SIS/Apple uniforms or property," asked him to return the uniforms, and said that if he failed "to return all uniforms" or "pay this amount immediately," SIS would assign the debt to its attorneys or a collection agency, which would "adversely affect [his] credit record and may impact [his] ability to borrow or obtain employment." The letter did not mention the overpayment, specify an amount owed, or explain what "this amount" meant.

Seltz and Vaughn declared that SIS did not hire any new employees to replace those that were laid off in October 2011 and that there were further reductions in SIS's force after that date as Apple moved more of its security work in-house. Zamora testified that after the lay-off, SIS continued to post ads for security officer, supervisor, and watch commander positions. He produced copies of two SIS ads: (1) for a watch commander posted on November 18, 2011, and (2) for a supervisor posted on April 25, 2012.

Zamora's doctors had not released him to return to full work duties any time prior to October 10, 2011, the date he was laid off. Dr. Kale testified that when he last saw Zamora in February 2012, he was not able to return to work in any capacity. Dr. Kale had given him injections to lubricate the knee, but they did not give him much relief, so Dr. Kale referred him to a joint specialist. Zamora had a second surgery on his left knee

11

in June 2012. The nature of that surgery and the name of the surgeon are not identified in the record. Since Insurer paid temporary disability benefits through November 8, 2012, we may infer that Zamora's condition became permanent and stationary as of that date.

Zamora claimed Seltz's allegedly defamatory statements made it hard for him to find work in private security after he was laid off. After the lay-off, Zamora took "small detail jobs," but did not obtain employment comparable to his job at SIS. Zamora's discovery responses listed employment with three security companies between October 2011 and November 2014.

In February 2013, Zamora settled his workers' compensation claim with SIS and Insurer. The settlement included any claim for partial permanent disability and a release of any discrimination claim based on Labor Code section 132a, which prohibits discrimination against an employee who files a workers' compensation claim. Upon approving the settlement, the workers' compensation judge ordered that the petition that Zamora had filed with the Workers' Compensation Appeals Board (WCAB) based on violations of Labor Code section 132a be dismissed.

Zamora testified that SIS's failure to accommodate his disability between June 2010 and November 2010 aggravated his knee injury. He believed it was against the law to terminate an employee who is temporarily disabled by an industrial injury and that he was laid off in retaliation for filing a workers' compensation claim. Zamora filed a complaint with the Department of Fair Employment and Housing (DFEH) and received a right-to-sue letter on October 5, 2012.

## II. PROCEDURAL HISTORY

### A. Complaint, Demurrer, & Special Motion to Strike

In October 2012, Zamora filed a wrongful termination action seeking compensatory damages, punitive damages, and attorney fees. Zamora's complaint

alleged that he was terminated because of his knee injury and disability and in retaliation for filing a workers' compensation claim. The complaint contained nine causes of action. They included five causes of action based on alleged violations of the FEHA, including: (1) disability discrimination (§ 12940, subd. (a)); (2) failure to accommodate (§ 12940, subd. (m)); (3) failure to engage in a good faith interactive process (§ 12940, subd. (n)); (4) retaliation (§ 12940, subd. (h)); and (5) wrongful termination. The complaint also alleged: (1) a common law cause of action for wrongful termination in violation of public policy based on the FEHA violations; (2) a statutory cause of action for wrongful termination based on alleged violations of Labor Code section 132a; (3) defamation; and (4) false light. The named defendants included SIS and Seltz (hereafter jointly Defendants). The defamation and false light claims were based on Seltz's statements to Vaughn and Bianchi that Zamora was "disrespecting the company" by not returning the overpayment.

In February 2013, Defendants filed a demurrer and a special motion to strike (Code Civ. Proc., § 425.16) the defamation and false light claims. Zamora opposed both. The trial court denied the special motion to strike, overruled the demurrer to the defamation claim, but sustained the demurrer to the false light claim without leave to amend. The court reasoned that since both claims were based on the same publications, the defamation claim provided a complete remedy and the false light claim was therefore superfluous.[4] Defendants subsequently filed a general denial, which is not in the record on appeal.

---

[4] Defendants appealed the trial court's order denying their special motion to strike in *Zamora v. Security Industry Specialists, Inc.*, Court of Appeal case No. H039629. On our own motion, we have taken judicial notice of this court's file in that case. (Evid. Code, §§ 452, subd. (d) & 459.) In April 2014, this court dismissed the prior appeal after Defendants failed to file an opening brief.

13

## B. *Defendants' Motion for Summary Judgment*

In June 2015, Defendants filed a motion for summary judgment or, in the alternative summary adjudication, challenging the remaining eight causes of action in Zamora's complaint. SIS argued that it was entitled to summary adjudication of the disability discrimination claim (§ 12940, subd. (a)) because Zamora could not establish a prima facie case of disability discrimination since there was no evidence that SIS had subjected him to any adverse employment action *because of* his disability and Zamora was not a "qualified individual capable of performing the essential functions of the job." SIS also argued that it had a legitimate, nondiscriminatory reason for terminating Zamora's employment based on the reduction in force and that Zamora did not have any evidence of pretext to rebut that reason.

SIS argued that it was entitled to judgment on the failure to accommodate claim (§ 12940, subd. (m)) because before November 17, 2010, Zamora continued to perform his regular job duties, did not seek medical treatment, did not present SIS with a list of physical restrictions, and never asked for an accommodation. SIS also argued that after November 17, 2010, it accommodated each of Zamora's requests for accommodation by granting him a medical leave of absence and multiple extensions of that leave. SIS argued that it was entitled to judgment on the claim for failure to engage in the interactive process (§ 12940, subd. (n)) because as soon as it became aware of the need for accommodation in November 2010, it granted his request for a medical leave. It also argued that to the extent he needed an earlier accommodation, Zamora failed to engage in the interactive process because he never provided SIS with a list of physical restrictions and did not ask for any assistance at work.

SIS contended that is was entitled to judgment on the retaliation claim (§ 12940, subd. (h)) because Zamora could not establish that he had engaged in any "protected activity" under FEHA because as a matter of law, requesting reasonable accommodation

14

is not a "protected" activity. SIS also argued that it had a legitimate, non-retaliatory reason for terminating Zamora's employment (the reduction in force) that Zamora could not demonstrate was a pretext for retaliation.

SIS argued that it was entitled to summary adjudication of Zamora's claims for wrongful termination in violation of public policy and wrongful termination in violation of FEHA (§ 12900 et seq.) because Zamora could not establish the underlying statutory violations that were the bases for those claims. SIS contended that it was entitled to judgment on Zamora's wrongful termination claim based on alleged violations of Labor Code section 132a and his defamation claim on multiple grounds. Zamora filed opposition to the motion for summary judgment/summary adjudication.

## C. *Trial Court's Order on Motion for Summary Judgment & Entry of Judgment*

The trial court granted the motion in part. It granted summary adjudication of the disability discrimination, retaliation, and defamation claims, as well as the three wrongful termination claims, but denied summary adjudication of the failure to accommodate and failure to engage in a good faith interactive process claim. Since the court denied summary adjudication of two claims, it denied the motion for summary judgment.

On the disability discrimination and wrongful termination claims, the court found that there were triable issues of fact regarding the essential functions of Zamora's position and whether Zamora could perform those functions with or without reasonable accommodation. Nonetheless, the court concluded, that SIS was entitled to summary adjudication of those claims because Zamora failed to make a prima facie showing that he was terminated *because of* his disability since he had failed to show that the two lower-ranking supervisors who were not laid off "were not members of the same protected group (i.e., that they had no disabilities)." The court held that the disability discrimination and two of the wrongful termination claims were subject to summary adjudication "on this basis alone."

15

The court found a second ground for granting summary adjudication, and held that SIS had shown a legitimate, nondiscriminatory reason for terminating Zamora based on (1) the downsizing of SIS's force due to Apple's reduction of its budget for SIS's services, and (2) the fact that Zamora "ranked as the fourth lowest supervisor" at the Cupertino site. The court held that the burden therefore shifted to Zamora to raise a triable issue of material fact that those reasons were pretextual. Zamora had argued that SIS's reasons were pretextual because: (1) he was terminated shortly after his doctor released him to return to modified work on October 3, 2011; and (2) two of the supervisors that ranked lower than he did were reassigned rather than terminated. The court held that "as a matter of law, the mere timing of an adverse employment action is insufficient to raise an inference that the employer took such an action for an unlawful purpose." As for the retention of the two lower-ranked supervisors, the court stated that "[w]hile this evidence does cast some doubt on SIS's reason for [Zamora's] termination, it [was] insufficient on its own to establish a triable issue of material fact as to whether [his] termination was based on his disability." The court held that Zamora "simply provide[d] no evidence from which a reasonable fact finder could infer that his knee injury or the physical restrictions attendant to the injury played any role in his termination." The court also held that since the FEHA-based wrongful termination claim was premised entirely on Zamora's disability discrimination claim, it too failed, and granted summary adjudication of that claim.

The court also granted summary adjudication of the retaliation claim. The court found that although there were triable issues on the question whether Zamora's "request for a reasonable accommodation on account of his disability constitute[d] protected activity under the FEHA," there were no triable issues with regard to whether SIS had a legitimate, non-retaliatory reason for terminating Zamora's employment, using the same analysis it applied to the disability discrimination claim.

16

The court granted summary adjudication of the wrongful termination claim based on violations of Labor Code section 132a, since Zamora's opposition did not attempt to demonstrate that the claim had merit. The court granted summary adjudication of the defamation claim based on Defendants' common interest privilege defense. Neither the Labor Code section 132a-based wrongful termination claim nor the defamation claim are at issue on appeal.

The court denied summary adjudication of the failure to accommodate and failure to engage in the interactive process claims, reasoning that Zamora had demonstrated a triable issue of fact on the question whether he had given SIS notice of his disability and his desire for an accommodation based on evidence that he asked Mazon for lighter work before taking a medical leave in November 2010. The parties subsequently stipulated to the dismissal of those claims without prejudice, and in July 2016, the court entered judgment for Defendants. Zamora filed a timely appeal from the judgment.

## III. DISCUSSION

### A. General Rules Regarding Summary Judgment & Summary Adjudication

"A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).) The statute thus authorizes motions for summary adjudication that "reduce the costs and length of litigation" by limiting the substantive areas of dispute. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1852, questioned on another ground as stated in *Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1094, fn. 2; see also, *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 97.) The object of the procedure is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

17

Summary adjudication motions are "procedurally identical" to summary judgment motions. (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290.) Summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be entitled to judgment, the moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. (*Id.*, subd. (a)(1).) A defendant moving for summary adjudication meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the claim. (*Id.*, subds. (o), (p)(2); *Aguilar, supra*, 25 Cal.4th at pp. 849-850, 853-854.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar*, at p. 850.) Material facts are those that relate to the issues in the case as framed by the pleadings. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67.) There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, at p. 845.)

## B. Standard of Review

We review an order granting summary judgment or summary adjudication de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*); *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) In undertaking our independent review, we apply the same three-step analysis used by the trial court. First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the

18

opposing party has demonstrated the existence of a triable issue of material fact. (*Varni Bros. Corp. v. Wine World, Inc*. (1995) 35 Cal.App.4th 880, 886-887.)

In performing our review, we view the evidence in a light favorable to the losing party—Zamora in this case—liberally construing his evidentiary submission while strictly scrutinizing moving party SIS's showing and resolving any evidentiary doubts or ambiguities in Zamora's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.) Both in the trial court and on appeal, the "court focuses on finding issues of fact; it does not resolve them. The court seeks to find contradictions in the evidence or inferences reasonably deducible from the evidence that raise a triable issue of material fact." (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143-1144 (*Trop*).)

## C. *Overview of the FEHA*

California's FEHA makes it an unlawful employment practice to discharge or discriminate against employees in the "terms, conditions, or privileges of employment" because of a physical or mental disability or medical condition. (§ 12940, subd. (a).) The FEHA, however, "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations . . . ." (§ 12940, subd. (a)(1).) The FEHA defines "mental disability" as a physical or mental condition that "limits a major life activity," such as working. (§ 12926, subd. (j).) "Limits" is synonymous with making the achievement of a major life activity "difficult." (*Id.*, subd. (m)(1)(B)(ii).)

The "FEHA proscribes two types of disability discrimination: (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate

19

effect on employees suffering from a disability (disparate impact discrimination)."
(*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 232 (*Moore*).)
This case involves disparate treatment discrimination.

The FEHA requires employers to make reasonable accommodations for employees with disabilities. It provides that "[i]t is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (m)(1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m)(1).) An employer, however, is not required to make an accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation." (*Ibid.*)

In addition to the obligation to make reasonable accommodation for a known physical or mental disability, the FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).) Section 12940 "imposes separate, independent duties on an employer to engage in the ' "interactive process" ' and to make ' "reasonable accommodations." ' " (*Moore*, *supra*, 248 Cal.App.4th at p. 232, quoting *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193.)

Regarding claims for retaliation, the FEHA makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).)

20

The FEHA's provisions may provide the policy basis for a claim for wrongful termination in violation of public policy. (*Phillips v. St. Mary Regional Medical Center* (2002) 96 Cal.App.4th 218, 227.)

### D. The <u>McDonnell Douglas</u> Test & Summary Adjudication in Employment Discrimination Cases

"Because state and federal employment discrimination laws are similar, California courts look to pertinent federal precedent in applying California statutes." (*Trop*, *supra*, 129 Cal.App.4th at p. 1144, citing *Guz*, *supra*, 24 Cal.4th at p. 354.) Generally, in cases alleging employment discrimination, California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Guz*, at pp. 354-355; *Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, 53 (*Glynn*); *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111 (*Reeves*).) This test "reflects the principle that *direct evidence* of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz*, at p. 354, italics added.)

Under the first step of the *McDonnell Douglas* test, the plaintiff may raise a presumption of discrimination by presenting a " 'prima facie case,' " the components of which vary depending upon the type of discrimination alleged. (*Reeves*, *supra*, 121 Cal.App.4th at p. 111.) "The elements of a disparate treatment disability discrimination claim are that the plaintiff (1) suffered from a disability or was regarded as suffering from a disability, (2) could perform the essential duties of a job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." (*Glynn*, *supra*, 42 Cal.App.5th at p. 53, fn. 1, citing *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310 (*Sandell*).) "A

21

satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff." (*Reeves*, at p. 112, citing *Guz, supra*, 24 Cal.4th at pp. 355-356.)

Under the second step of the *McDonnel Douglas* test, "the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. [Citation.] At that point the presumption disappears." (*Reeves, supra*, 121 Cal.App.4th at p. 112.) Under the third step of the test, the "plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 356.) In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, " '[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . .' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)

" '[W]e must keep in mind that the *McDonnell Douglas* test was originally developed for use at trial [citation], not in summary judgment proceedings.' " (*Arteaga v. Brink's, Inc*. (2008) 163 Cal.App.4th 327, 343–344 (*Arteaga*).) When seeking summary judgment or summary adjudication in an employment discrimination case, the burdens established by the *McDonnell Douglas* framework are altered. The "employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." (*Hicks v. KNTV Television, Inc*. (2008) 160 Cal.App.4th 994, 1003, citing *Guz, supra*, 24 Cal.4th at p. 357.) If the employer satisfies its initial burden, it " ' "will be entitled to summary [adjudication] *unless the plaintiff produces admissible evidence which raises a triable*

*issue of fact material to the defendant's showing*.  In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary [adjudication], 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " . . .  Thus, " '[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary . . . adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue*.' " ' " (*Arteaga*, at p. 344, second italics added.)  "[F]rom commencement to conclusion, the party moving for summary [adjudication] bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

Whether judgment as a matter of law is appropriate will depend on a number of factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.  (*Guz, supra*, 24 Cal.4th at p. 362.)  However, many employment cases present issues of intent and motive, issues not determinable on paper.  Such cases "*are rarely appropriate for disposition on summary judgment*, however liberalized [summary judgment standards may] be."  (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286, italics added.)

Additional standards apply in disability discrimination cases.  (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 122-128 (*Wallace*).)  "Although the same statutory language that prohibits disability discrimination also prohibits discrimination based on race, age, sex, and other factors," disability discrimination claims are "fundamentally different from the discrimination claims based on the other factors listed in section 12940, subdivision (a).  These differences arise because (1) additional statutory provisions apply to disability discrimination claims, (2) the Legislature made separate

findings and declarations about protections given to disabled persons, and (3) discrimination cases involving race, religion, national origin, age and sex, often involve pretexts for the adverse employment action—an issue about motivation that appears less frequently in disability discrimination cases." (*Id.* at p. 122.) The *Wallace* court noted that the Legislature made "substantial changes to the disability discrimination provisions of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the FEHA" in 2000 and held that while "an employer's honest but mistaken belief in legitimate reasons for an adverse employment action can preclude liability in other discrimination contexts, such as race, age or sex," (*id.* at p. 124) the statutory changes " 'provide protection when an individual is *erroneously or mistakenly believed* to have any physical or mental condition that limits a major life activity.' " (*Wallace*, at p. 124, quoting § 12926.1, subd. (d).)

The *Wallace* court held that the trial court erred in instructing the jury that animus or ill will was required to prove discriminatory intent in a disability discrimination case. "California law does not require an employee with an actual or perceived disability to prove that the employer's adverse employment action was motivated by animosity or ill will against the employee. Instead, California's statutory scheme protects employees from an employer's erroneous or mistaken beliefs about the employee's physical condition (§ 12926.1, subd. (d).)" (*Wallace*, *supra*, 245 Cal.App.4th at p. 115.) "In short, the Legislature decided that the financial consequences of an employer's mistaken belief that an employee is unable to safely perform a job's essential functions should be borne by the employer, not the employee, even if the employer's mistake was reasonable and made in good faith." (*Ibid.*)

### E. Direct or Circumstantial Evidence?

Zamora contends that the *McDonnell Douglas* framework does not apply to his disability discrimination and FEHA-based wrongful termination claims because he

24

presented direct evidence that "he was subjected to adverse employment action because of his disability."

### 1. *Governing Legal Principles*

Courts have held that the three-stage *McDonnell Douglas* framework does not apply when the employee presents *direct evidence* of discrimination. (*Trop*, *supra*, 129 Cal.App.4th at p. 1144, citing *Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121 and *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150-151, fn. 7 ["The *McDonnel Douglas* test is typically used in cases where the plaintiff lacks 'direct' evidence of the employer's discriminatory intent."].) " 'Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor.' " (*Trop*, at p. 1145 [discrimination based on sex, which includes pregnancy], quoting *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68 (*Morgan*) [race discrimination].) " '[T]he plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." ' [Citations.] Circumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis. [Citations.] With direct evidence of pretext, ' "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." [Citation.] The plaintiff is required to produce "very little" direct evidence of the employer's discriminatory intent to move past summary judgment.' " (*Morgan*, at pp. 68-69, fn. omitted, quoting *Chuang v. University of California Davis* (9th Cir. 2000) 225 F.3d 1115, 1128.)

California courts examined the use of direct evidence in cases involving disability discrimination in *Glynn*, *supra*, 42 Cal.App.5th at page 53 and *Wallace*, *supra*, 245 Cal.App.4th at pages 123 and 129. The *Wallace* court stated that "*disability discrimination cases often involve direct evidence of the role of the employee's actual or perceived disability in the employer's decision to implement an adverse employment action. Instead of litigating the employer's reasons for the action, the parties' disputes in disability cases focus on whether the employee was able to perform essential job functions, whether there were reasonable accommodations that would have allowed the employee to perform those functions, and whether a reasonable accommodation would have imposed an undue hardship on the employer.*" (*Wallace*, at p. 123.) The court cautioned that "courts and practitioners should not automatically apply principles related to the *McDonnell Douglas* test to disability discrimination cases. Rather, they should examine the critical threshold issue and determine whether there is direct evidence that the motive for the employer's conduct was related to the employee's physical or mental condition." (*Ibid.*; accord *Glynn*, at p. 53.)

2. **Since There is no Direct Evidence of Discrimination, the <u>McDonnell Douglas</u> Framework Applies.**

Zamora contends that since he presented direct evidence of discrimination, the *McDonnell Douglas* framework does not apply. If there was direct evidence of discrimination, very little evidence was required; if Zamora's opposition was based on circumstantial evidence, then Zamora was required to present substantial evidence of employer's discriminatory intent. (*Wallace*, *supra*, 245 Cal.App.4th at p. 123; *Morgan*, *supra*, 88 Cal.App.4th at pp. 68-69.)

SIS responds that Zamora did not argue that there was direct evidence of discrimination in the trial court and that, regardless of whether he relies on direct or circumstantial evidence, Zamora cannot establish the third element of his prima facie

26

case: that he was terminated *because of* his disability. We have reviewed Zamora's opposition to the motion for summary adjudication. As SIS contends, he argued below that the *McDonnell Douglas* framework applied and did not assert that there was direct evidence of discrimination. We shall nonetheless address Zamora's contention that there was direct evidence of discrimination in this case.

Direct evidence is evidence that proves a fact without inference or presumption. (*Trop*, *supra*, 129 Cal.App.4th at p. 1145.) Direct evidence includes comments that demonstrate discriminatory animus and a causal relationship between those comments and the adverse employment action. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550.) The following cases provide examples of direct evidence of discrimination.

The employee in *Wallace* injured his knee while working for the county as a deputy sheriff. (*Wallace*, *supra*, 245 Cal.App.4th at p. 116.) After he had knee surgery, he returned to work on light duty, initially in the property and evidence room and later as a bailiff. (*Id.* at pp. 116-117.) After the parties obtained an agreed medical examination, which set forth Wallace's work restrictions, the county removed him from his light duty job as a bailiff and placed him on an *unpaid leave* of absence based on its good faith—but incorrect—assessment that because of his restrictions he could not safely perform his duties as a bailiff even with reasonable accommodation. (*Id.* at pp. 115, 133.) The employee alleged that he could continue to work as a bailiff; he also suggested two other county jobs that he could perform with his restrictions. The county took the position that an *unpaid leave* of absence was a reasonable accommodation. (*Id.* at p. 118.) The appellate court concluded that *Wallace* was a direct evidence case and that the burden-shifting test from *McDonnell Douglas* therefore did not apply. (*Id.* at pp. 122-123.) Notably, the employer did not assert any other reason for placing the employee on unpaid leave other than his physical disability and the decisionmakers'

27

erroneous belief that Wallace could not safely perform the duties of a bailiff with those restrictions.

The employee in *Glynn* was a pharmaceutical salesman whose duties included driving. After Glynn developed a serious eye condition, his doctor authorized him to be off work because he could not drive safely, and Glynn took a medical leave of absence. The employer had a reasonable accommodation policy that provided for reassignment to a vacant position, and while on medical leave, Glynn applied for several open positions that did not require driving, but he was not reassigned. The employer's policy also required termination after the employee was *approved for* long term disability (LTD). After Glynn was off work for six months, a human resources employee sent him a letter, which stated that he was being terminated because he had been approved for LTD since he could not return to work with or without reasonable accommodation. But while Glynn was *eligible to apply for* LTD due to the passage of time, he had neither applied for nor been approved for LTD. Glynn protested his termination and told the employer he never applied for LTD and could work in any position that did not require driving. Nine months later, the employer admitted that the letter had been sent in error, agreed that the interactive process could have been handled better, and offered to reinstate Glynn's employment with back pay. (*Glynn*, *supra*, 42 Cal.App.5th at pp. 50-52.) On appeal, the parties agreed that Glynn was not totally disabled. (*Id.* at p. 54.) The court concluded that Glynn had "provided direct evidence of disability discrimination—[the employer] terminated him because [a human resources employee] mistakenly believed he was totally disabled and unable to work," and held that this was enough to defeat summary adjudication. (*Ibid.*)

Zamora relies on *Schnidrig v. Columbia Machine* (9th Cir. 1996) 80 F.3d 1406. The plaintiff in *Schnidrig* alleged age discrimination after his employer failed to promote him. The plaintiff, who was 61 years old, presented evidence that on six occasions,

28

different members of the board of directors told other directors, a company manager, or the plaintiff that the directors wanted someone aged 45 to 50 for the job, or that they were not considering the plaintiff because they wanted a younger man. The employee's evidence included notes of a board meeting, which documented that one of the directors said they should look for someone aged 45 to 50. (*Id.* at pp. 1408-1409.) The court held that "Schnidrig offered direct evidence of discriminatory motives in the form of statements made by directors and notes taken during Board meetings," (*id.* at pp. 1409-1410) which was sufficient to raise a triable issue of fact on the question whether the employer relied on impermissible factors when it refused to promote Schnidrig. (*Id.* at pp. 1409-1411.)

Zamora contends that the direct evidence here consisted of: "1) SIS's failure to report [his] injury; 2) denial of [his] requests for modified work; 3) failure to communicate with [him] and to provide him with modified work per the doctor's notes[;] 4) [his] termination based on his lack of attendance when the only absences that [he] had were related to his disability[;] and 5) the person who made the decision to terminate him had the knowledge of [his] disability and request for accommodations."

This is not direct evidence. Unlike *Wallace* and *Glynn*, where the evidence proved directly that the employers took adverse action against the employees based on erroneous conclusions about their disability, there is no direct evidence here that SIS laid Zamora off or treated him differently from other low-ranked supervisors who were not laid off because of his disability. Unlike *Schnidrig*, Zamora's evidence did not include statements by anyone at SIS or documentary evidence that showed that he was laid off because of his disability. The five facts that Zamora describes are at best circumstantial, requiring us to infer that SIS had a discriminatory motive. Since Zamora relies on circumstantial evidence, we shall proceed to analyze this case under the *McDonnell Douglas* framework as applied in summary adjudication cases.

29

## F.  *Disability Discrimination & FEHA-Based Wrongful Termination Claims*

Renewing arguments it made below, SIS contends that the trial court properly granted summary adjudication of the disability discrimination and wrongful termination in violation of FEHA claims (the first and sixth causes of action) because Zamora cannot establish two elements of his prima facie case.  SIS also argues that it had a legitimate, nondiscriminatory reason for terminating Zamora and that Zamora failed to demonstrate a triable issue by producing substantial evidence that the reason was untrue or pretextual.

As noted, to establish a prima facie case, Zamora was required to show that he: (1) suffered from a disability, (2) could perform the essential duties of a job with or without reasonable accommodation, and (3) was subjected to an adverse employment action *because of* the disability or perceived disability.  (*Glynn*, *supra*, 42 Cal.App.5th at p. 53, fn. 1.)  To establish a prima facie case, the employee must show " ' " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . . .' " ' " (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2.)  The employee's burden of proving a prima facie case is not onerous, and very little evidence is required at this step.  (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751 (*Heard*).)

It is undisputed that Zamora suffered from a qualifying disability under the FEHA based on his workplace knee injury.  SIS challenges the second and third elements of Zamora's prima facie case.

### 1.  *Second Element of Prima Facie Case:  Whether Zamora Could Perform the Essential Duties of a Job With or Without Reasonable Accommodation*

SIS contends that Zamora cannot establish the second element of his prima facie case:  whether he could perform the essential duties of a job with or without reasonable accommodation.  The trial court found that Zamora had raised a triable issue on the

30

second element, reasoning that there were factual disputes regarding the essential functions and physical requirements of his job as a standard deployment field supervisor. On appeal, rather than focus on the job description or physical requirements of the position, as the trial court did, SIS relies on the fact that prior to his termination, Zamora's doctor had not released him to work in any capacity and Zamora remained totally temporarily disabled when he was laid off.

Zamora responds that we may not consider this point because the trial court ruled in his favor on the second element and he did not raise the issue in his opening brief. Under our de novo standard of review, when reviewing the grant of summary adjudication, we must independently determine the construction and effect of the facts presented to the trial court as a matter of law. (*Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1515.) We may affirm summary adjudication on any correct legal theory, as long as the parties had an adequate opportunity to address that theory in the trial court. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.) Since this was raised below and the parties have had an adequate opportunity to brief the issue on appeal, we shall address it.

Although section 12940 proscribes discrimination on the basis of disability, it expressly limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties. Section 12940 expressly provides: "This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations." (§ 12940, subd. (a)(1).) "By its terms, section 12940 makes it clear that drawing distinctions on the basis of physical or mental

31

disability is not forbidden discrimination *in itself*.  Rather, drawing these distinctions is prohibited *only if* the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation.  Therefore, in order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation." (*Green v. State of California* (2007) 42 Cal.4th 254, 262.)

The procedural posture of this case presents a question regarding the scope of our consideration.  Under the FEHA, disability discrimination (§ 12940, subd. (a)), failure to accommodate (§ 12940, subd. (m)), and failure to engage in the interactive process (§ 12940, subd. (n)) are separate unlawful employment practices for which a damages action will lie after the plaintiff obtains a right-to-sue letter.  (*Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 357; § 12965.)  In his complaint, Zamora pleaded each of these unlawful practices as a separate cause of action.  After the trial court denied summary adjudication of the failure to accommodate and failure to engage in the interactive process claims, the parties stipulated to dismiss those two claims without prejudice, presumably so that Zamora might appeal the trial court's adverse ruling on the disability discrimination claim before the case goes to trial.  Since the failure to accommodate and failure to engage in the interactive process claims are not before us in this appeal, may we consider allegations that SIS failed to accommodate Zamora's disability and failed to engage in the interactive process in addressing his disability discrimination claim?

For the following reasons, we conclude the answer is yes.  First, questions regarding the employer's failure to accommodate and engage in the interactive process are relevant to all three claims.  Indeed, the second element of Zamora's prima facie case

32

for disability discrimination, requires him to demonstrate that he could perform the essential duties of a job with or without reasonable accommodation. (*Glynn*, *supra*, 42 Cal.App.5th at p. 53, fn. 1.) Second, in *Nadaf-Rahrov v. Neiman Marcus Group, Inc*. (2008) 166 Cal.App.4th 952 (*Nadaf-Rahrov*), the court treated the employer's alleged failure to accommodate (§ 12940, subd. (m)) and failure to engage in interactive process (§ 12940, subd. (n)) as components of the disability discrimination (§ 12940, subd. (a)) claim because the plaintiff's complaint alleged "all three of these unlawful employment practices" (*Nadaf-Rahrov*, at p. 962) as part of her disability discrimination claim. (*Id.* at pp. 962-969.) The plaintiff's complaint in *Nadaf-Rahrov* cited subdivisions (m) and (n) of section 12940 in her disability discrimination cause of action. She also pleaded failure to accommodate (§ 12940, subd. (m)) and failure to engage in interactive process (§ 12940, subd. (n)) as separate causes of action in her complaint. (*Nadaf-Rahrov*, at pp. 960, 971-972, 978.) Like the complaint in *Nadaf-Rahrov*, Zamora's complaint alleged separate causes of action for each of these claims. Although he did not expressly mention subdivisions (m) and (n) of section 12940 in his disability discrimination cause of action, the facts he incorporated into that claim alleged failures to accommodate and to engage in the interactive process. For these reasons, we conclude that we may consider SIS's alleged failures to accommodate and engage in the interactive process in evaluating the disability discrimination claim.[5]

The FEHA requires employers to make reasonable accommodation for the known disabilities of employees and applicants to enable them to perform the essential functions of a position, unless doing so would produce undue hardship to the employer's

---

[5] By acknowledging that Zamora's failure to accommodate claim as a component of his disability discrimination claim, we are not expressing any views on the merits of Zamora's claims for failure to accommodate or failure to engage in the interactive process, which are not before us in this appeal. We do agree with the trial court, however, that there were triable issues as to those claims.

operations. (§ 12940, subd. (m); *A.M. v. Albertsons* (2009) 178 Cal.App.4th 455, 463.) Employers who are aware of an employee's disability, as SIS was, have an "affirmative duty" to make reasonable accommodations for such disability, "unless the employer . . . can demonstrate, after engaging in the interactive process, that the accommodation would impose an undue hardship." (Cal. Code Regs., tit. 2 (hereafter "2 CCR"), § 11068, subd. (a); see *Prilliman v. United Air Lines, Inc*. (1997) 53 Cal.App.4th 935, 950-951 (*Prilliman*) [employer "has an affirmative duty to make known to the employee other suitable job opportunities with the employer and to determine whether the employee is interested in, and qualified for, those positions, if the employer can do so without undue hardship or if the employer offers similar assistance or benefit to other disabled or nondisabled employees or has a policy of offering such assistance or benefit to any other employees"].)

An employer must engage in a "timely, good faith interactive process" *in response to* a request for reasonable accommodation by an employee like Zamora who has a known physical disability or medical condition. (§ 12940, subd. (n); 2 CCR, § 11069, subd. (a).) This duty arises even if the employee has not requested any accommodation. The employer must *initiate* the interactive process if it becomes aware of the need for accommodation through a third party, like Insurer or Dr. Kale in this case. (2 CCR, § 11069, subd. (b); *Faust v. California Portland Cement Co*. (2007) 150 Cal.App.4th 864, 887.) This is a continuing duty and the fact that the employer took some steps to identify a reasonable accommodation does not absolve the employer of liability for failure to engage in the interactive process if it is responsible for a later breakdown in the process. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 986.) The interactive process contemplates that the disabled employee and the employer will communicate directly with one another. But while direct communication between employer and employee is preferred, communication with the employee's agents may

34

suffice in some circumstances. (2 CCR, § 11069, subd. (d)(4); *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 247 [employer communicated with employee's attorney]; *Hanson v. Lucky Stores, Inc*. (1999) 74 Cal.App.4th 215, 229 (*Hanson*) [employer consulted injured worker's doctors and vocational rehabilitation counselor].) A supervisor is the employer's agent for the purpose of this duty and if a supervisor acquires knowledge that he or she had a duty to report to the employer, there is a conclusive presumption that the supervisor has done so. (*California Fair Employment & Housing Commission v. Gemini Aluminum Corp*. (2004) 122 Cal.App.4th 1004, 1015.) Thus, regardless of whether Mazon had timely reported Zamora's injury and early requests for modified duty to SIS, since he was Zamora's supervisor, a presumption arose that he had done so.

The FEHA and the regulations of the DFEH set forth a non-exhaustive list of possible accommodations. (§ 12926, subd. (p); 2 CCR, § 11065.) Relevant examples of reasonable accommodations include, but are not limited to: transferring an employee to a more accessible worksite, job restructuring, providing a part-time or modified work schedule, providing additional training, providing paid or unpaid leave for treatment and recovery, and reassignment to a vacant position. (§ 12926, subd. (p); 2 CCR, § 11065, subd. (p)(2)(C), (E), (F), (K), (M), (N), § 11068, subds. (c) & (d).)

A leave of absence also may be a reasonable accommodation if, after the leave, the employee can return to work, with or without further reasonable accommodation, and the leave does not create an undue hardship for the employer. (2 CCR, § 11068, subd. (c).) "[A] finite leave can be a reasonable accommodation under FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties." (*Hanson*, *supra*, 74 Cal.App.4th at p. 226.) But, if the employee "can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence. An employer, however, is not required to

35

provide an indefinite leave of absence as a reasonable accommodation." (2 CCR, § 11068, subd. (c); *Wallace*, *supra*, 245 Cal.App.4th at p. 134.) "Holding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future." (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263 (*Jensen*), citing *Hanson*, at p. 226; *Dark v. Curry County* (9th Cir. 2006) 451 F.3d 1078, 1090 ["[R]ecovery time of unspecified duration may not be a reasonable accommodation (primarily where the employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all)"].) The FEHA does not have a fixed limit on the amount of leave required as a reasonable accommodation. "[A] disabled employee is entitled to a reasonable accommodation—which may include leave of no statutorily fixed duration—provided that such accommodation does not impose an undue hardship on the employer." (*Sanchez v. Swissport, Inc.* (2013) 213 Cal.App.4th 1331, 1338.)

Offering a disabled employee who can no longer perform the essential functions of his or her job a vacant position may be a reasonable accommodation even if the new position pays less than the original job. (§ 12926, subd. (p); 2 CCR, § 11065, subd. (p)(2)(N); *Hanson*, *supra*, 74 Cal.App.4th at p. 227.) Suggesting that the disabled employee check available job postings, as SIS did when it terminated Zamora, does not satisfy the employer's duty to reassign or transfer a disabled employee to a vacant position, since the employer is in a better position than the employee to know what jobs are vacant or may become vacant in the near future to which the employee may be assigned. (*Spitzer v. The Good Guys, Inc*. (2000) 80 Cal.App.4th 1376, 1389-1390; *Swanson v. Morongo Unified School Dist*. (2014) 232 Cal.App.4th 954, 970 [employer had a duty to reassign disabled worker if an already funded, vacant position at the same

36

level exists].) In addition, the FEHA entitles a disabled employee to "preferential consideration" in reassignment of existing employees. (2 CCR, § 11068, subd. (d)(5); *Jensen*, *supra*, 85 Cal.App.4th at p. 265.) The employer is not required to create a new position or to promote to accommodate disabled employees unless it has a policy or practice of creating new positions for disabled workers. (2 CCR, § 11068, subd. (d)(4); *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 965-966; *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 771-772.)

In evaluating the second element of Zamora's prima facie case, we find *Nadaf-Rahrov*, which applied many of the rules set forth above, instructive. The disabled employee in that case worked as a clothes fitter in a department store for over 18 years. She developed pain in multiple joints, including her back, ankles, shoulders, and fingers, and took a medical leave in November 2003, which was extended multiple times by her doctor. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 967-968.) In January 2004, the employee told the employer she could not return to her fitter job due to her disability and asked to be reassigned to another position. Thereafter, the parties attempted to engage in an interactive process to identify possible jobs the employee could do. In June 2004, the employee's physician reported that " 'she may be able to return to work on 8/16/04 but not in her previous position.' " (*Id.* at p. 959.) Less than a month later, in July 2004, the employer terminated the employee "because she 'did not have a release from her doctor to perform work of any kind' and 'given her existing (and continuing) restrictions, she was not qualified to fill any open and available position,' nor did she 'provide [the employer] any reason to believe that her condition was likely to change anytime in the near future.' In other words, [the employee] was fired because [the employer's human resources manager] believed her disability prevented her from performing the essential functions of any available position in the company." (*Id.* at p. 963.)

Since the employee did not dispute the she was unable to perform the essential functions of her former position, the court held that she could satisfy the second element of her prima facie case by showing that she could perform the essential functions of a vacant position with or without accommodation. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 963.) The "position must exist and be vacant, and the employer need not promote the disabled employee." (*Ibid.*) The court held that to prevail on summary adjudication of the disability discrimination claim, the employer "must show there is no triable issue of fact about [the employee's] ability, with or without accommodation, to perform the essential functions of an available vacant position that would not be a promotion." (*Ibid.*) Reviewing the employee's evidence, the court held that she had raised a triable issue of fact about whether her doctor's reports had "established that she was unable to perform work of any kind at the time of her termination or in the foreseeable future" (*id.* at p. 965) and that a reasonable fact finder could find that the medical evidence indicated that she could work in another position consistent with her restrictions. (*Id.* at pp. 964-966.) The court concluded that while the employee's restrictions were substantial, they did not "self-evidently prevent [her] from performing any work whatsoever *with or without accommodation*." (*Id.* at p. 967.) The court stated that it could not "conclude that no reasonable fact finder could find that Nadaf-Rahrov could perform *any work* with accommodation given her physical limitations" and that on the facts of that case, she had "raised a triable issue of fact about whether vacant desk jobs for which she was otherwise qualified were available." (*Id.* at p. 967.)

Further, the court reviewed the employee's evidence regarding possible openings she could have filled though November 2004 (four months after her discharge) and stated, "Jobs available during the extended time period are relevant because it may have been a reasonable accommodation for Neiman Marcus to extend Nadaf-Rahrov's leave of absence for a limited period of time until a position became available that Nadaf-Rahrov

38

could perform, particularly if Neiman Marcus could have anticipated the future opening." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 968, citing *Hanson*, *supra*, 74 Cal.App.4th at p. 226.) The court concluded that the employee had "raised a triable issue of fact that she was unlawfully discharged because of her disability because Neiman Marcus could have but did not provide her with a reasonable accommodation (reassignment to a vacant position) that would have allowed her to continue working with the company" and reversed summary adjudication of her disability discrimination claim. (*Nadaf-Rahrov*, at p. 969.)

*Barns v. Workers' Comp. Appeals Bd.* (1989) 216 Cal.App.3d 524, 535 (*Barns*), questioned on another ground in *Gelson's Markets v. Workers' Comp. Appeals Bd*. (2009) 179 Cal.App.4th 201, 209, is also relevant here. The *Barns* court held that an employer may not terminate an employee on workers' compensation disability leave, "unless the employer *reasonably* believes that the worker is *permanently* disabled from performing the job, or will be disabled for such a long time that termination is necessary in light of demonstrated business realities." (*Barns*, at p. 535.) To meet this standard, the "employer must have some evidence that the injury itself is sufficiently permanent and stable to permit a prognosis with reasonable medical certainty." (*Id*. at p. 536 [termination not justified where it occurred five months *before* the employee's condition was deemed permanent and stationery].) Although *Barns* involved discrimination based on Labor Code section 132a, not the FEHA, we find these standards instructive. Zamora was terminated in October 2011, more than a year before his condition became permanent and stationary in November 2012. The record does not indicate what level of permanent disability, if any, he suffered; there was no evidence he was totally disabled from doing any work, and there was evidence that he eventually found security work elsewhere.

Applying the precepts of these cases here, we note that SIS had an affirmative duty to engage in the interactive process with Zamora and make reasonable accommodations for his disability, including advising him of other suitable job opportunities. (*Prilliman*, *supra*, 53 Cal.App.4th at pp. 949-950.) A finite medical leave can be a reasonable accommodation (*Hanson*, *supra*, 74 Cal.App.4th at p. 226), and initially, SIS accommodated Zamora's disability by providing him with a medical leave of absence. SIS continued his salary for several months while Insurer investigated the claim. After Insurer accepted the claim, Insurer paid Zamora temporary disability and the salary continuance stopped.

If an employer can provide an accommodation other than a medical leave, it cannot require an employee to take a leave. (2 CCR, § 11068, subd. (c).) On June 24, 2011, five and a half weeks after Zamora had surgery, Insurer initiated the process of investigating modified duty for Zamora, presumably as a means of reducing its continuing liability to provide temporary disability benefits and the cost of the claim. Modified work also generally benefits injured workers.[6] Dr. Kale provided information regarding Zamora's restrictions and in mid-July 2011, Ortiz and Vaughn proposed offering him a temporary position as an administrative supervisor and training him for that position. While these may have been reasonable accommodations within the meaning of the statutes and regulations (2 CCR, § 11065, subd. (p)(2)(E), (K), (N)), SIS never discussed the administrative supervisor position with Zamora as it was required to do as part of the interactive process. "Although reassignment to a temporary position is

---

[6] "Modified work in the prior job is usually the best solution when possible. The injured worker retains the wages, working conditions, and hours of his [or her] prior employment and remains in a job that is familiar to [the employee]. . . . The employer benefits by retaining an employee who is already trained in the job, knows the company and product, and has proven his [or her] reliability in the past." (Silberman & Wulz, Rehabilitation: The California System (5th ed. 1992) Plan Development: Immediate Employability, p. 264.)

not considered a reasonable accommodation" under DFEH regulations, "an employer . . . may offer, and an employee may choose to accept or reject, a temporary assignment during the interactive process." (2 CCR, § 11068, subd. (d)(3).)

Even if the position was temporary, it may have been a reasonable accommodation until Zamora was released to full duties or his condition became permanent and stationary. For example, the employer in *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215 reassigned the employee, a police officer who suffered an industrial injury to his knee, to a temporary light-duty position to accommodate him while the injury healed. (*Id*. at p. 1218.) The employee remained in that position for six years until his physician told the city his disability was permanent and he could no longer work as a police officer. (*Ibid*.) The employer told the employee it had no available permanent positions as a police officer for someone with his qualifications, and offered him a job as a civilian police technician. (*Id*. at p. 1219.) The employee declined the offer, took disability retirement, and sued the employer under the FEHA, contending the employer failed to reasonably accommodate his limitations by making his temporary position permanent. (*Ibid*.) Affirming summary judgment in the employer's favor, the appellate court held that the employer had no obligation under the FEHA to make the temporary light-duty position available indefinitely once the employee's disability was permanent and stationery. (*Id*. at pp. 1217–1218.) While the employee was entitled to a reasonable accommodation, the employer was not required to make a temporary position permanent. (*Id*. at p. 1227.) While assignment to a temporary light duty position may be a reasonable accommodation, the record does not explain why the light duty positions here were not offered to Zamora before he returned to his doctor and was placed back on total temporary disability in July and September 2011.

As in *Nadaf-Rahrov*, the evidence here raises a triable issue of fact as to whether Zamora could have worked in another position at SIS with his restrictions. Dr. Kale

41

released him to return to modified work in late June 2011 and again in late September 2011. On both occasions, there was evidence that SIS had at least one vacant position that Zamora could do with his restrictions, specifically, the administrative supervisor job in July and the corporate driver job in early October. Indeed, Bianchi thought Zamora would be "great" for the driver job. As a disabled employee, Zamora was entitled to preferential consideration for reassignment to both positions. And yet, on both occasions, even though there were vacant lighter duty jobs Zamora could perform, SIS did not discuss those positions with Zamora.

There was also evidence that in September and October 2011, after SIS learned of the need for a reduction in force, it had an employee named Lu who worked as an administrative supervisor. The record does not indicate when Lu was hired, whether this is the same administrative supervisor position that SIS considered offering to Zamora, or whether Lu was also disabled. Lu's name was not on the list of field supervisors who were evaluated for possible layoff and Lu continued working for SIS after Zamora was laid off. A reasonable jury could find, drawing all inferences from the evidence in favor of Zamora, that if Zamora had been offered the administrative supervisor position in mid-July or mid-September, he may have returned to work then, been insulated from the lay-off, and continued working for SIS.[7]

"Although an employer need not provide repeated leaves of absence for an employee who has a poor prognosis for recovery [citation], the mere fact that a medical leave has been repeatedly extended does not necessarily establish that it would continue

_____

[7] Because this is an appeal from a grant of summary adjudication, we must view the evidence in the light most favorable to the party opposing the motion, Zamora. "We do not intend to suggest that, at trial, a fact finder should or will weigh [the] evidence and draw the same inferences that we raise in this opinion. Rather, we simply conclude that a fact finder could reasonably draw such inferences." (*Sandell, supra,* 188 Cal.App.4th at p. 310, fn. 3.)

indefinitely." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 988.) In some circumstances, an employer may need to consult directly with the employee's physician to determine the employee's medical restrictions and prognosis. (*Ibid.*) When Zamora was laid off at the end of September 2011, it appeared likely that he would return to work in the near future. Although Dr. Kale had rescinded his previous modified duty release on July 27, 2011, when he released Zamora in mid-September 2011, Zamora had even fewer restrictions than he had in July. And when Dr. Kale placed Zamora back on disability on September 30, 2011, he expected Zamora could return to work in two weeks. Even if Zamora ultimately needed to extend his medical leave further, a knee injury with surgery is the type of injury from which people generally heal in the foreseeable future. Unlike the employee in *Nadaf-Rahrov*, who was permanently precluded from returning to her regular job, there was no evidence that Zamora could not return to work as a standard deployment supervisor in the future. In addition, Zamora's evidence included SIS's ad for an open supervisor's position in April 2012. It may have been a reasonable accommodation for SIS to extend Zamora's medical leave for a limited period of time until a position became open that he could perform, particularly if SIS could have anticipated the opening. (*Nadaf-Rahrov*, at p. 967.) As noted, there was no evidence that Zamora's injury totally disabled him from doing any work. In fact, there was evidence that he eventually returned to work in the security field.

Zamora testified that in April or May 2011, Vaughn told him that he would be offered a new supervisor's position that required him to spend less time on his feet. Except for the timing, his testimony is consistent with SIS documents, which showed that in July 2011, Vaughn suggested SIS offer Zamora a modified position as an administrative supervisor. A jury may reasonably infer that Zamora was mistaken about the timing or that Vaughn considered this option and mentioned it to Zamora before discussing it with Ortiz in July 2011.

43

The employer in *Nadaf-Rahrov*, like SIS, argued that the employee's doctor had never released her to return to work in any position and focused on a medical certification the doctor had completed, which stated that the employee was unable to do work of any kind. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 964-965.) But when the employee was terminated, her doctor expected that she would be able to return to work the following month, " 'but not in her previous position.' " (*Id.* at p. 959.) The court concluded that the employee had raised a triable issue of fact about whether she "was unable to perform work of any kind at the time of her termination or in the foreseeable future" based on further medical records and a declaration from her doctor. (*Id.* at pp. 965-966.) The court reasoned that although the employee's restrictions were substantial, "they did not self-evidently prevent [the employee] from performing any work whatsoever *with or without accommodation*." (*Id.* at p. 967.) The employee produced evidence that the employer had eight different jobs that she could do with her restrictions, that she was qualified to do those jobs based on her prior experience, and that the jobs were below her former pay range and therefore were not promotions, as well as a declaration from her doctor that she could do several of those jobs, including clerical work. (*Id.* at pp. 967-969.) The appellate court concluded that the disabled employee had "raised a triable issue of fact that she was unlawfully discharged because of her disability because [her employer] could have but did not provide her with a reasonable accommodation (reassignment to a vacant position) that would have allowed her to continue working with the company" and reversed summary adjudication of the disability discrimination claim. (*Id.* at p. 969.)

In this case, SIS retained, but demoted, two of the supervisors who ranked lower than Zamora, and in early October 2011, SIS considered at least one option for retaining Zamora, too, by offering him the corporate driver job. But SIS never discussed either the administrative supervisor or the driver job with Zamora and never actually offered him

44

any alternative position. Based on this lack of communication and evidence that there were vacant positions, a jury could find, drawing all reasonable inferences from the evidence in favor of Zamora, that SIS failed to engage in or caused a breakdown in the interactive process by refusing to provide information about available positions that might have assisted Zamora in returning to modified work and avoiding the lay-off. Given the employer's duty to engage in an interactive process, the fact Zamora's condition had not stabilized by the time of the lay-off, the existence of alternative, vacant positions that Zamora may have been able to do with his physical restrictions, and the possibility of extending his medical leave until an appropriate position became open, we conclude that SIS has not met its burden of showing that "there is no triable issue of fact about [Zamora's] ability, with or without accommodation, to perform the essential functions of an available vacant position that would not be a promotion." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 963.) We therefore reject SIS's contention that it met its burden of demonstrating no triable issue of material fact as to the second element of Zamora's prima facie case.

2. ***Third Element of Prima Facie Case: Whether Zamora Was Treated Differently Because of His Disability***

SIS's motion for summary adjudication also challenged the third element of Zamora's prima facie case, which required him to show that he was subjected to an adverse employment action *because of* his disability. (*Glynn*, *supra*, 42 Cal.App.5th at p. 53, fn. 1.) Section 12940, subdivision (a) provides that it is an unlawful employment practice for an employer "to discriminate against [an employee] in compensation or in terms, conditions, or privileges of employment" "because of" the employee's physical disability, unless the difference in treatment is "based upon a bona fide occupational qualification." (§ 12940, subd. (a).) As used in that section, the term " 'to discriminate' " means to treat differently. (*Wallace*, *supra*, 245 Cal.App.4th at p. 126.)

45

An employer "has treated an employee differently 'because of' a disability when the disability is a substantial motivating reason for the employer's decision to subject the employee to an adverse employment action." (*Id.* at p. 128.) Thus, to prevail on summary adjudication of the disability discrimination and FEHA-based wrongful termination claims based on the third element of Zamora's prima facie case, SIS was required to show that Zamora could not demonstrate that SIS treated him differently from other employees because of his disability and that the disability was a substantial motivating reason for the disparate treatment. (*Wallace*, *supra*, at pp. 127-128, citing *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 211-215.) As noted, Zamora's burden of proving his prima facie case is not onerous, and very little evidence is required at this step. (*Heard*, *supra*, 44 Cal.App.4th at p. 1751.)

The trial court found that Zamora failed to raise a triable issue regarding the third element because he had failed to show that Murillo and Lopez—the two lower-ranked supervisors who were retained, but demoted—"were not members of the same protected group (i.e., that they had no disabilities)" and held that the disability discrimination and FEHA-based wrongful termination claims were subject to summary adjudication on that basis alone. Zamora argues that the trial court "misused the 'similarly situated' concept to require" him to prove that Murillo and Lopez were not disabled and that the court erred because his evidence created triable issues of fact as to the third element. SIS responds that the "similarly situated" concept is relevant and argues that Zamora did not present any evidence of causation.

This court addressed the use of the similarly-situated standard in *Heard*, *supra*, 44 Cal.App.4th 1735, where a Black employee alleged race discrimination in the application of the terms and conditions of his employment. The case went to trial. In addressing the employee's claim of instructional error, this court rejected the employer's contention that the employee was required to prove, as part of his prima facie case, that similarly situated

46

non-Black employees received the employment terms and conditions that he sought. (*Id.* at pp. 1739, 1754.) This court reasoned that such a requirement was never included in the prima facie model described in *McDonnel Douglas* and other United States Supreme Court cases, and explained that the "framework was established to resolve the 'elusive factual question of intentional discrimination.' [Citation.] Although proof regarding similarly situated employees outside the protected class may be one way of raising an inference of intentional discrimination, *it is not the only way. . . .* [T]he *McDonnell Douglas* framework was never intended to be mechanical or ritualistic. [Citation.] The purpose of the prima facie case is for the plaintiff to produce evidence demonstrating that the employment decision occurred in 'circumstances which allow the court to infer unlawful discrimination.' " (*Id.* at p. 1755.) "To state that a plaintiff may never establish a prima facie case if the plaintiff fails to produce evidence that similarly situated employees outside the protected class were promoted, restricts unfairly the circumstances from which discrimination may be inferred" (*ibid.*) and "unfairly emphasizes one way of proving intentional discrimination instead of properly focusing upon the pivotal issue . . .—whether a *particular individual* was discriminated against and why." (*Id.* at pp. 1755-1756.) Although other employees' disability status may be relevant in evaluating SIS's motives, those characteristics go to the weight of the evidence rather than its legal sufficiency. (*Id.* at p. 1756.)

SIS acknowledges the holding in *Heard* and argues that "[c]ontrary to Zamora's suggestion, neither the trial court nor [SIS] concluded this is the 'only way' to raise such an inference. It was, however, the 'only way' Zamora attempted to show *pretext* in opposing summary judgment." SIS contends that the trial court therefore properly considered whether Murillo and Lopez were outside of Zamora's protected class. But the question we are presently considering is the third element of Zamora's prima facie case (whether he was terminated *because of* his disability) not pretext, which applies to a

47

different step in the *McDonnel Douglas* framework. Moreover, our review of Zamora's opposition papers reveals that he did not make the argument SIS attributes to him. Based on *Heard*, we conclude that the trial court improperly relied on the "similarly situated" requirement and will review Zamora's evidence to determine whether it permits a trier of fact to reasonably infer that Zamora was treated differently because of his disability.

Zamora argues that the evidence that he was terminated *because of* his disability consisted of: "1) SIS's failure to report [his] injury; 2) denial of [his] requests for modified work; 3) failure to communicate with [him] and to provide him with modified work per the doctor's notes[;] 4) [his] termination based on his lack of attendance when the only absences that [he] had were related to his disability[;] and 5) the person who made the decision to terminate him had the knowledge of [his] disability and request for accommodations." Zamora's brief does not explain how these facts demonstrate that his disability was a substantial motivating reason for his layoff.

We understand Zamora's first theory to refer to Mazon's failure to report the injury between June and October 2010, because it was undisputed that when Zamora gave Dr. Blatz's report to Vaughn on October 15, 2010, Vaughn had Zamora fill out the pertinent forms and a formal report of work injury was made that same day. But company policy also required Zamora to report the injury. And despite the late report, both SIS and Insurer accepted liability for Zamora's workers' compensation claim. This evidence does not support a reasonable inference that Mazon's failure to report the injury between June and October 2010 was a substantial motivating factor in SIS's decision to lay Zamora off in September 2011.

Zamora's second theory is that his termination was "based on a lack of attendance" due to his disability and medical leave. He bases this contention on SIS's October 3, 2011 letter—its second letter about the lay-off—which stated that SIS had been trying to contact Zamora by phone to discuss his employment status for two days

48

and had left three messages to which he had not responded. The letter then stated that "[d]ue to [his] lack of attendance and no correspondence," SIS was "sending this notification to inform" him that "due to the restructuring of the security program, [SIS had] been forced to cut certain positions' and that his position had been 'impacted by these cuts.' " Zamora reads too much into this letter. Although the letter could have been more artfully worded, it stated that because Zamora was not at work and not responding to phone messages, SIS was "sending this notification" (a letter) to inform him that his position had been cut due to restructuring. The references to "lack of attendance" and "no correspondence" explain why SIS was communicating by letter, not why he was being laid off. This becomes more evident when the letter is read in context with SIS's September 29 letter notifying Zamora of the layoff. Zamora did not produce any other evidence that he was terminated because of a lack of attendance and when ranking the supervisors, the evaluators gave him a high score (four out of five) for "availability." Thus, for the purpose of summary judgment, the evidence does not support a reasonable inference that Zamora was terminated because of a lack of attendance caused by his disability.

Zamora contends that evidence that SIS denied his requests for modified work, and failed to communicate with him and provide him with modified work per the doctor's notes created triable issues whether he was laid off because of his disability. In other words, he relies on evidence that SIS failed to both accommodate his disability and engage in the interactive process, which we have already discussed at length, as evidence that it discriminated against him because of his disability. SIS refers to this as "Zamora's modified duty theory" and argues that once Zamora started his medical leave, "he could not return to work in any capacity before his termination. SIS's doctor rescinded his prior status reports releasing him with restrictions, and SIS was not obligated to create a new position for Zamora." SIS acknowledges that claims for failure to accommodate and

49

disability discrimination have different, *but overlapping*, elements. (*Jensen*, *supra*, 85 Cal.App.4th at p. 256.)

*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686 is pertinent. The employee in *Roby* suffered from a medical condition that caused her to miss work on short notice; the medication she took caused an unpleasant body odor and, in connection with the condition, she developed a nervous disorder that resulted in sores on her arms. The employer terminated the employee for violating its attendance policy. The employee sued on a variety of theories, including disability discrimination and harassment in violation of the FEHA (§ 12940, subd. (j)(1)). (*Roby,* at pp. 694-697.) Both claims require a showing that the disparate treatment or harassment was "because of" the employee's medical condition. The case went to trial and in analyzing the evidence on the harassment claim, the California Supreme Court stated, "the jury could infer, based on the discrimination evidence, that supervisor Schoener's hostility was '*because of* . . . [Roby's] medical condition.' . . . Specifically, the jury could draw this inference from the evidence that Schoener—who knew about Roby's medical condition—applied employer McKesson's attendance policy without making any accommodation or even inquiring if an accommodation was possible. The jury could also draw this inference from the degrading manner in which Schoener would announce to the office that Roby was 'absent again' and from the demeaning comments, gestures, and facial expressions Schoener made in response to Roby's body odor and arm sores." (*Id.* at pp. 710-711.) Thus, in evaluating the causation element, the court held that evidence of the employer's failure to accommodate or even ask if an accommodation was possible could support an inference that the employee was terminated because of her medical condition.

As in *Roby*, Zamora's manager and SIS upper management knew he had a disability. Zamora presented evidence that SIS failed to accommodate his disability and to engage with him in the interactive process. Although there was evidence that in 2011,

50

SIS had two positions that Zamora could have done with his restrictions, SIS never communicated with him about either job. At the time of the lay-off, Dr. Kale had extended Zamora's disability for just two more weeks. A jury could reasonably infer that if an offer of modified work had been made, Zamora might have attempted to do the job. As noted, SIS may also have been able to accommodate his disability by merely extending his medical leave rather than laying him off. As in *Roby*, a jury could reasonably infer from this evidence that Zamora was laid off because of his disability.

Other evidence bolsters this inference. When SIS considered offering Zamora modified work in July 2011, Harville sent an e-mail suggesting that any offer of modified duty be contingent on Zamora returning the overpayment and that SIS be prepared to terminate him if he chooses not to accept the "return to work [*sic*] agreement." Thus, before anyone talked to Zamora about a reasonable accommodation, and before Apple advised SIS that it was reducing its budget for SIS's services, Harville suggested terminating Zamora if he did not agree to refund the overpayment as a condition of accommodating his disability. Vaughn also mentioned termination in his June 1, 2011 e-mail.

Zamora contends that he was treated differently from Murillo and Lopez, two of the supervisors whose positions were eliminated in the reduction in force, because rather than laying them off, SIS found other positions for them that were not promotions. Although the trial court concluded that Zamora was required to prove that Murillo and Lopez were not disabled, a jury could reasonably infer that they were more able-bodied than Zamora, since they were reassigned to patrol officer positions. Moreover, Zamora identified a vacant job that he could have performed at the time he was laid off as a corporate driver. And it was undisputed that Vaughn could not explain why SIS preserved Murillo's and Lopez's jobs, but not Zamora's.

51

SIS repeatedly took the position that for Zamora to return to work in any capacity, he would have to reimburse the overpayment. This came up in April 2011 when Seltz learned that Zamora had applied for a job at another SIS site and again in May 2011. Seltz testified that SIS ultimately decided not to impose the condition for multiple reasons, including that Zamora might not be able to afford to pay the money back or needed to return to work to pay SIS back, and that Seltz questioned whether SIS could legally require Zamora to pay it back. But SIS documents showed that up until the date SIS terminated Zamora, it continued to condition any return to work on reimbursing the overpayment. As noted, Harville raised the issue in both June and July 2011; Seltz raised the issue in September 2011 in an e-mail to Bianchi; and SIS's "Employee Termination Form" completed in October 2011 stated that Zamora was not eligible for rehire because he "must reimburse SIS for extra wages." These documents are inconsistent with Seltz's testimony that SIS ultimately decided not to impose the condition. SIS also conceded that the overpayment was due to a human resources error and therefore its mistake. While there were disputed facts about whether Vaughn ever orally requested reimbursement from Zamora, there was no evidence that SIS ever sent Zamora anything in writing explaining the overpayment or demanding reimbursement, as Ortiz proposed in her July 2011 draft letter.

In addition, there were ways of resolving the problem presented by the overpayment. Overpayments of temporary disability are common in workers' compensation cases and the Labor Code authorizes a credit for such overpayments against permanent disability or other workers' compensation benefits. (Lab. Code, § 4909; Hanna, Cal. Law of Employee Injuries and Workers' Compensation (2d. ed. 2019) § 7.04[9][a] ["policy mandates that credit be given in order to encourage employers to make voluntary payments"].) The WCAB also has the discretion under Labor Code section 4909 to allow credit for wage payments voluntarily made by an

52

employer.  (*Ott v. Workers' Comp. Appeals Bd.* (1981) 118 Cal.App.3d 912, 921.)  The record suggests SIS did not take advantage of this option since the compromise and release agreement in Zamora's workers' compensation case, which was negotiated long after Zamora was terminated, does not mention the overpayment.

In addition to any inferences that a jury might reasonably draw from SIS's failure to accommodate Zamora, a jury might reasonably infer, based on the inconsistencies in the evidence about SIS's intentions about the overpayment, SIS's failure to demand reimbursement while at the same time making any return to work conditional on reimbursement, the availability of other means to resolve the issue, the fact that SIS assumed that the overpayment was Zamora's fault and, for unexplained reasons, later accused him of workers' compensation fraud, and failed to continue Zamora's medical leave instead of laying him off, that SIS harbored some animosity toward Zamora about his disability and workers' compensation claim.  There were also disputed facts about whether Vaughn orally asked Zamora to reimburse the overpayment.

For these reasons, we conclude that SIS has not conclusively negated this element of Zamora's prima facie case and that Zamora's evidence raised a triable issue of fact that he was discharged because of his disability.

### 3. *SIS's Showing of a Legitimate, Nondiscriminatory Reason for Terminating Zamora & Zamora's Evidence of Pretext*

In addition to challenging Zamora's prima facie case, as an alternate ground for its motion, SIS argued that it had a legitimate, nondiscriminatory reason for terminating Zamora's employment based on the reduction in force.  On appeal, Zamora challenges the adequacy of SIS's showing that it had a legitimate, nondiscriminatory reason for his discharge.  He also argues that his evidence demonstrated that "SIS's proffered reason was a pretext."

53

In *Guz*, our state Supreme Court observed that " '*there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory*.' " (*Guz*, *supra*, 24 Cal.4th at p. 362, quoting *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 148-149 (*Reeves*).) Summary adjudication for the employer may be appropriate where, even though the employee's evidence "may technically constitute a prima facie case, [it] is too weak to raise a rational inference that discrimination occurred." (*Guz*, at p. 362.) Whether summary adjudication is appropriate will depend on a number of factors, including the "strength of the plaintiff's prima facie case," the " 'strength of the employer's showing of innocent reasons,' " "any countervailing circumstantial evidence of discriminatory motive," the " 'probative value of the proof that the employer's explanation is false,' " and any other evidence that supports the employer's case. (*Ibid.*) Having concluded that Zamora can state a prima facie case, we must therefore determine whether SIS is nonetheless entitled to summary adjudication of the disability discrimination and FEHA-based wrongful termination claims.

The trial court held that SIS's evidence that "(1) the impetus for the overall down-sizing originated from a $7 million reduction in Apple's budget for SIS's security services; and (2) [Zamora's] termination was due to the fact that he was ranked as the fourth lowest supervisor at the Apple Cupertino facility" was sufficient meet its burden of demonstrating a legitimate, nondiscriminatory reason for Zamora's discharge and that the burden therefore shifted to Zamora to raise a triable issue of material fact that those reasons were pretextual. The court stated that Zamora had argued that SIS's reasons were pretextual because: (1) he was terminated shortly after his doctor released him to return to modified work on October 3, 2011; and (2) two of the supervisors that ranked lower than he did were reassigned rather than terminated. The court held that "as a

54

matter of law, the mere timing of an adverse employment action is insufficient to raise an inference that the employer took such an action for an unlawful purpose." As for the retention of the two lower-ranked supervisors, the court stated that "[w]hile this evidence does cast some doubt on SIS's reason for [Zamora's] termination, it is insufficient on its own to establish a triable issue of material fact as to whether [his] termination was based on his disability." The court held that Zamora "simply provide[d] no evidence from which a reasonable fact finder could infer that his knee injury . . . played any role in his termination."

### a. *Legal Principles*

*Guz* is instructive since it involved employer downsizing. The employee in *Guz* alleged age discrimination after his employer, Bechtel, eliminated his working unit and absorbed his unit's work into another unit as a cost saving measure, and offered others, but not Guz, jobs in the other unit. (*Guz, supra*, 24 Cal.4th at pp. 329-331.) Bechtel argued "that the exercise of its prerogative to eliminate Guz's work unit and position constitutes, as a matter of law, a legitimate, nondiscriminatory reason for his termination." (*Id.* at pp. 357-358.) The court responded: "However, downsizing alone is not necessarily a sufficient explanation, under the FEHA, for the consequent dismissal of an age-protected worker. An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may 'use the occasion as a convenient opportunity to get rid of its [older] workers.' " (*Id.* at p. 358.) The court also stated, "[o]n the other hand, if nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons . . . in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Ibid*.) Other examples

55

of legitimate reasons are a failure to meet performance standards (*Trop*, *supra*, 129 Cal.App.4th at p. 1149) or a loss of confidence in an employee (*Arteaga*, *supra*, 163 Cal.App.4th at p. 352).

In *Guz*, the California Supreme Court emphasized that "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361.) It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive. (*Hersant*, *supra*, 57 Cal.App.4th at p. 1004; *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 595-596.) Rather it is incumbent upon the employee to produce "substantial responsive evidence" demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer. (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1039; *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735.)

As the court stated in *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570 (*Soria*), generally, "pretext may be demonstrated by showing ' "the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge." ' (*Hanson*[, *supra*,] 74 Cal.App.4th 215, 224; see also *Hersant*[, *supra*,] 57 Cal.App.4th 997, 1005 [pretext may be shown by ' "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons' " ']; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715 [court may 'take [into] account . . . manifest weaknesses in the

cited reasons [for termination] in considering whether those reasons constituted the real motive for the employer's actions, or have instead been asserted to mask a more sinister reality'].)  However, simply showing the employer was lying, without some evidence of discriminatory motive, is not enough to infer discriminatory animus.  'The pertinent [FEHA] statutes do not prohibit lying, they prohibit discrimination.'  (*Guz . . .* , *supra*, 24 Cal.4th at p. 361; [citation].)  ' "Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before [the] termination." ' " (*Soria*, at p. 594.)

As noted, we must apply these standards in light of the "substantial changes" the Legislature made to the disability discrimination statutes in late 2000, about the same time the Supreme Court filed its decision in *Guz*.[8]  (*Wallace*, *supra*, 245 Cal.App.4th at p. 124.)  Thus, while "an employer's honest but mistaken belief in legitimate reasons for an adverse employment action can preclude liability in other discrimination contexts, such as race, age or sex," the statutory changes " 'provide protection when an individual is *erroneously or mistakenly believed* to have any physical or mental condition that limits a major life activity.' " (*Ibid.*)  As noted, "California law does not require an employee with an actual . . . disability to prove that the employer's adverse employment action was motivated by animosity or ill will against the employee.  Instead, California's statutory scheme protects employees from an employer's erroneous or mistaken beliefs about the employee's physical condition (§ 12926.1, subd. (d).)" (*Wallace*, at p. 115.)  "In short, the Legislature decided that the financial consequences of an employer's mistaken belief that an employee is unable to safely perform a job's essential functions should be borne

---

[8] The Governor signed the legislation that made these changes on September 30, 2000, and the legislation took effect on January 1, 2001.  (Stats. 2000, ch. 1049, p. 7697; Gov. Code, § 9600.)  *Guz* was filed on October 5, 2000.  (*Guz*, *supra*, 24 Cal.4th 317.)

by the employer, not the employee, even if the employer's mistake was reasonable and made in good faith." (*Ibid.*)

### b. *Analysis: SIS's showing of a legitimate, nondiscriminatory reason is inadequate for summary adjudication*

We begin by reviewing SIS's asserted legitimate, nondiscriminatory reasons for discharging Zamora. Zamora does not dispute: (1) that SIS was required to lay off 10 percent of its Apple-assigned work force due to budget cuts by Apple, which included four supervisory positions at the Cupertino site; (2) that SIS (Vaughn and four watch commanders) conducted a competitive evaluation of the 19 supervisors at the Cupertino site; and (3) that he ranked 16th, which was among the bottom four. Instead, he argues that SIS "engaged in intentional discrimination when deciding which individual workers to retain and release." (*Guz*, *supra*, 24 Cal.4th at p. 358.) Zamora argues that SIS did not sustain its burden of demonstrating a legitimate, nondiscriminatory reason for terminating his employment because it failed to explain why: (1) Murillo and Lopez, two of the four supervisors whose positions were eliminated, both of whom ranked lower than Zamora, were reassigned to other positions; and (2) SIS did not consider reassigning him to another position but instead laid him off. He cites undisputed evidence that Vaughn could not explain why Murillo and Lopez were not laid off when their positions were eliminated.

The trial court held that while this evidence "cast some doubt on SIS's reason for [Zamora's] termination," it was "insufficient on its own" to raise a triable issue of fact as to whether he was terminated "based on his disability." The court erred in considering this evidence in isolation. "A plaintiff's burden is . . . to produce evidence that, *taken as a whole*, permits a rational inference that intentional discrimination was a substantial motivating factor in the employer's actions toward the plaintiff." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 377, italics added.)

58

In addition, the trial court did not consider this point in evaluating whether SIS had met it burden of establishing a legitimate, nondiscriminatory reason for terminating Zamora.

The *Guz* court explained that "[i]nvocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them." (*Guz*, *supra*, 24 Cal.4th at p. 358.) After Guz's unit was eliminated, Bechtel reorganized the unit that took over the functions of his old unit by reassigning two people from Guz's old unit to work there, retaining or promoting three people who already worked in that unit, and hiring an existing Bechtel employee to fill one slot. Bechtel's evidence and separate statement set forth reasons unrelated to Guz's age that explained why Bechtel decided to make each of these staffing choices based on the job requirements and experience of each of the six employees. Its evidence also explained why Guz was not reassigned to the other unit. (*Id*. at pp. 358-360, 363-364.) The California Supreme Court described Bechtel's evidence in detail when reviewing both the question whether the employer had demonstrated a legitimate, nondiscriminatory reason for its action and the employee's evidence in response. It noted that Guz's showing did not dispute this evidence and that Bechtel's reasons were largely uncontradicted, and concluded that Bechtel had demonstrated a legitimate, nondiscriminatory reason, which Guz had failed to contradict with evidence of pretext or discriminatory motive. (*Ibid.*)

Since Zamora alleges SIS engaged in intentional discrimination in deciding which individual workers to retain and release, SIS's moving papers were required to address and explain these points. (*Guz*, *supra*, 24 Cal.4th at p. 358.) In contrast to the evidentiary showing in *Guz,* SIS made no effort to explain why Murillo and Lopez—who were ranked lower than Zamora—were retained and reassigned, and Zamora was terminated. While SIS's undisputed material facts (UMF) Nos. 22 to 28 described the

59

reasons for the reduction in force, the evaluation and ranking of the supervisors, and provided a reason why Zamora ranked in the bottom four, SIS did not explain why Murillo and Lopez were retained and Zamora was released, except to assert in UMF No. 48 that Zamora "could not have filled any 'promised' position because he was never certified to return to work." (Zamora disputed this fact, noting that he had been released for modified work twice and SIS made no attempt to accommodate his disability.) Zamora disputed SIS's UMF's Nos. 22 to 28 with evidence that Murillo and Lopez were retained and reassigned; that Vaughn could not explain why they were not laid off after their positions were eliminated; and Zamora was not reassigned. Thus, the issue was before the trial court. *Guz* provided a detailed roadmap for how the employer should present its evidence to obtain summary adjudication in a case involving a reduction in force, but SIS failed to follow that map. Since SIS's evidence failed to explain why Murillo and Lopez were retained and Zamora was released, we conclude that its showing was inadequate to demonstrate a legitimate, nondiscriminatory reason for Zamora's discharge.

### c. *Analysis: Zamora presented substantial evidence of pretext or discriminatory intent*

As part of our analysis we also examine Zamora's circumstantial evidence of pretext or discriminatory intent. One way to show pretext is to demonstrate that the proffered reason was insufficient to motivate discharge. (*Hanson*, *supra*, 74 Cal.App.4th at p. 224.) In our view, for the reasons stated when discussing Zamora's prima facie case, a jury could reasonably conclude that SIS's proffered reason was insufficient to motivate discharge in light of SIS's duty to accommodate Zamora's disability; its failure to engage in the interactive process and explore reasonable accommodations for Zamora; the fact that at the time of his discharge, Zamora was expected to return to work just two weeks after the lay-off, and a light duty position as a driver was available; the option to

60

extend his medical leave existed; and there were other reasonable means for addressing the issue of the alleged overpayment of funds to him. As noted, California's statutory scheme protects Zamora from SIS's erroneous or mistaken beliefs about his physical condition or ability to return to work. (*Wallace*, *supra*, 245 Cal.App.4th at p. 115, citing § 12926.1, subd. (d).)

Other factors courts have considered in evaluating discriminatory motive include the timing of the employer's action, the identity of the person who made the adverse employment decision, and the employee's job performance before termination. (*Soria*, *supra*, 5 Cal.App.5th at p. 594.) We review the evidence as a whole. Where the employee presents several matters "which *by themselves* will not constitute substantial evidence that [the employer's] stated reason for firing [the employee] was pretextual or that [the employer] acted with a discriminatory animus" when it took adverse action against the employee, the court must consider "whether these matters, *when taken together*, do constitute sufficient evidence to demonstrate a triable issue of fact." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 758 (*Johnson*).)

In evaluating the timing in a disability discrimination case, the timing of the adverse employment action in relation to the amount of time the employee has been on medical leave and the employee's anticipated recovery or return to work date may be relevant. Although Zamora had been on medical leave for 10 months when he was terminated, SIS discharged him less than five months after he had knee surgery, while he was still recovering from surgery. SIS decided to lay Zamora off in September 2011. Coincidentally, on September 12, 2011, Zamora's doctor released him to return to modified work with restrictions, starting October 3, 2011. The company sent him a letter notifying him of the layoff on September 29, 2011. A day later, his doctor extended his

61

disability two weeks.  On the day he was laid off, he was expected to return to light duty in five days.

Moreover, SIS had a duty to accommodate Zamora's disability and engage in the interactive process to determine whether the driver position or some other job was a reasonable accommodation for Zamora.  Rather than engage in the interactive process, SIS decided to include Zamora in the lay-off, even though there was a vacant driver position he may have been able to perform as a temporary accommodation on his then-anticipated release date.  SIS's evidence does not explain why the vacant driver position was not offered to Zamora, who would have had priority in reassignment because of his disability.  The timing of Zamora' discharge around the time he was expected to return to work supports a reasonable inference that SIS elected to lay him off rather than engage in the interactive process and accommodate his disability.

In addition, there was no evidence that it would have been a hardship for SIS to accommodate his disability or to extend Zamora's medical leave while he continued to recover from surgery, until his condition became permanent and stationary.  SIS was no longer paying salary continuance and Zamora was collecting *temporary disability* from Insurer.  This underscores the *temporary* nature of his disability.  When he was fired, he was on *temporary disability* because his doctor expected that he would eventually return to work and his condition had not yet stabilized.  In July 2011, Ortiz suggested SIS not make any decisions about his employment status until his condition stabilized.

While the record identifies Vaughn and four watch commanders as the persons who evaluated the supervisors for the purpose of ranking their performance, it does not disclose the identity of the person who made the ultimate decision to lay Zamora off as opposed to reassigning him to another position or job site, accommodating his disability, or extending his medical leave.  SIS did not explain why these other options for managing Zamora's disability were not considered.

62

As for Zamora's job performance before he was discharged, Zamora's evidence included a copy of a performance evaluation. Although undated, it appears to have been prepared about the time Zamora went on medical leave in the fall of 2010 since it was authored by Zamora's "newly appointed" watch commander, Ely Albalos, who we may infer took over that job after Mazon was terminated in October 2010. Albalos rated Zamora's attitude and initiative as "good" (4 on a scale of 5), described Zamora as "an invaluable asset," and said he had an "amazing rapport" with the staff. He described ways in which Zamora had taken it upon himself to assist the standard deployment, stated that Zamora had received "several positive comments from Apple employees about his customer service skills," and described one of those interactions. Overall, Albalos rated Zamora's performance as "satisfactory" (3 out of 5). He also noted that Zamora had requested training in report writing. Although his scores on the comparative ranking for the reduction in force are generally consistent with this performance evaluation, the 2010 performance evaluation did not contain the complaint about Zamora's communication skills that SIS considered when ranking the supervisors for the reduction in force in September 2011. It appears Zamora worked less than a month between the time of his 2010 performance evaluation and the date he went on medical leave. " '[I]nconsistencies in performance evaluations prior and subsequent to an employee's termination may support an inference of pretext.' " (*Johnson*, *supra*, 173 Cal.App.4th at p. 759.) Here, Zamora presented evidence of a very positive performance evaluation that was inconsistent with the criticism of his performance that SIS made when it evaluated him and placed him among the lowest ranking supervisors.

In addition, there was some evidence of discriminatory motive in the way SIS handled the overpayment. First, it initially accused Zamora of misrepresenting the date he started receiving temporary disability, when in fact the overpayment was a result of SIS's own error. As noted, there were inconsistencies in the evidence regarding whether

63

SIS intended to pursue the overpayment. Zamora's UMF No. 42 asserted that unbeknownst to him, SIS conditioned his return to work on reimbursement of the overpayment, "effectively blocking any prospect" that he would ever return to work at SIS. SIS disputed this fact, citing Seltz's testimony that SIS did not impose this condition. But as we have noted, Zamora's evidence showed that up until the day he was terminated, SIS repeatedly conditioned any return to work in any capacity on reimbursement of the overpayment, even though Seltz questioned whether the company could legally do so. While SIS decided that Zamora had to reimburse the overpayment in order to return to work in any capacity, its failure to communicate that condition to Zamora in writing may support an inference of pretext. And as noted before, there were other reasonable means for addressing the overpayment issue. A few weeks after Zamora was terminated, Venturini sent an e-mail to Ortiz accusing Zamora of "ripping off" SIS. In addition, SIS paid Zamora more than $17,000 in salary continuance, even though it did not have a policy of continuing the salaries of industrially injured workers. This evidence supports a reasonable inference that SIS management was unhappy with Zamora because he had filed a workers' compensation claim that cost the company thousands of dollars, which in turn relates to his disability.

Taken together, this constitutes substantial evidence of discriminatory animus toward Zamora's disability that raised a triable issue regarding the reasons for his discharge.

In summary, Zamora presented sufficient evidence to support a prima facie case that he could perform the essential duties of a job with or without accommodation and that he was treated differently from other employees because of his disability. SIS's showing of a legitimate, nondiscriminatory reason for Zamora's discharge was incomplete because it failed to explain why Murillo and Lopez were reassigned while Zamora was terminated. And Zamora presented substantial evidence of discriminatory

64

animus that raised a triable issue of material fact regarding the true reason he was discharged. We therefore conclude that the summary adjudication of Zamora's disability discrimination and FEHA-based wrongful termination claims must be reversed.

### G. *Wrongful Termination in Violation of Public Policy*

Zamora's fifth cause of action alleges a common law claim for wrongful termination in violation of public policy. He concedes that this claim is based on the same alleged FEHA violations as his disability discrimination and FEHA-based wrongful termination claims. The parties agree that this cause of action therefore rises and falls with those claims. (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 135-136.) Since we hold that SIS did not meet its burden of establishing that it was entitled to summary adjudication of Zamora's disability discrimination and FEHA-based wrongful termination claims, we hold that the trial court also erred when it granted summary adjudication of the common law wrongful termination claim.

### H. *Retaliation*

Zamora's fourth cause of action alleges retaliation in violation of section 12940, subdivision (h), which prohibits employer retaliation against an employee as a result of the employee engaging in certain protected conduct. Section 12940, subdivision (h) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because *the person has opposed any practices forbidden under this part* or because *the person has filed a complaint, testified, or assisted in any proceeding under this part*." (Italics added.) To establish a prima facie case of retaliation, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) If the employee presents a prima facie case of retaliation, the court

then employs the three-stage *McDonnell Douglas* framework to analyze the employee's claim. (*Ibid.*)

### 1. Background

Zamora's complaint alleges that SIS unlawfully retaliated against him for "engaging in protected activities . . . , including but not limited to: 1) requesting time off for medically related conditions; 2) notifying [SIS] that he might need future days off from work for medically related conditions; and 3) requesting reasonable accommodations."

In seeking summary adjudication of this claim, SIS argued both that Zamora could not state a prima facie case because he did not engage in any protected activity and that it had a legitimate, nondiscriminatory reason for terminating Zamora. As to the first point, SIS argued that Zamora could not state a prima facie case because, as a matter of law, requesting time off for his disability or seeking a reasonable accommodation is not protected activity, citing *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 380-381, which relied on *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 652 (*Rope*).

At the hearing of the motion, Zamora argued that *Nealy* was inconsistent with the Legislature's then-recent enactment of Assembly Bill No. 987 (Assembly Bill 987), which added subdivision (m)(2) to section 12940. As amended, effective January 1, 2016, subdivision (m)(2) of section 12940 makes it unlawful: "[f]or an employer . . . to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted." (§ 12940, subd. (m)(2); Stats. 2015, ch. 122, § 2; *Moore*, *supra*, 248 Cal.App.4th at p. 245.) Since the activity at issue here occurred in 2011, the trial court requested supplemental briefing on the question whether the 2015 amendment of section 12940 applied retroactively to the

conduct at issue here. In their supplemental briefs, the parties disputed whether Assembly Bill 987 merely clarifies existing law—in which case it would apply to transactions occurring before its enactment—or represents a change in the law. Zamora argued that language in both Assembly Bill 987 and the legislative history of the statute demonstrated an intent to clarify the law. SIS argued that since Assembly Bill 987 would not take effect until January 1, 2016—which was after the hearing on the motion—it had no bearing on this case; that Zamora could not overcome the strong presumption against retroactive application of the statute; and that Assembly Bill 987 does not declare existing law.

The trial court held that the legislative findings and declarations in section 1 of Assembly Bill 987, which included a statement of intent to overrule *Rope*, *supra*, 220 Cal.App.4th 635, "indicate the Legislature's intent to clarify that [the] FEHA has always prohibited retaliation based on a request for an accommodation and the *Rope* Court's interpretation of the statute is incorrect." The court found that the Senate and Assembly committee reports "indicate that the bill would not constitute a change in the law, but would only clarify that an employee cannot be retaliated against for requesting a reasonable accommodation." "Given the statements in the bill itself and the legislative history," the trial court found that "the Legislature merely clarified existing law in response to a contrary appellate court decision" and that Zamora therefore met his prima facie burden of showing that he was engaged in a "protected activity." Applying the same reasoning it used on other claims, the trial court concluded that SIS was nonetheless entitled to summary adjudication of the retaliation claim because it had shown a legitimate, nonretaliatory reason for terminating Zamora, which he had failed to rebut with substantial evidence of discriminatory intent.

### 2. *Zamora Cannot Demonstrate a Prima Facie Case, Since he did not Engage in Protected Activity*

After the trial court entered its order, two appellate courts reviewed the retroactive application of section 12940, subdivision (m)(2) in *Moore*, *supra*, 248 Cal.App.4th at pages 245 to 247, and *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 941-944 (*Cornell*). Both held that section 12940, subdivision (m)(2) does not apply retroactively to employer conduct that occurred before January 1, 2016. (*Moore*, at p. 247; *Cornell*, at pp. 943-944.)

In *Rope*, the court "determined that there was 'no support in the regulations or case law for the proposition that a mere request—or even repeated requests—for an accommodation, without more, constitutes a protected activity sufficient to support a claim for retaliation in violation of FEHA.' [Citation.] Rather, 'case law and FEHA's implementing regulations are uniformly premised on the principle that the nature of activities protected by section 12940, subdivision (h) demonstrate *some degree of opposition to or protest of the employer's conduct or practices* based on the employee's reasonable belief that the employer's action or practice is unlawful. (See Cal. Code. Regs., tit. 2, former § 7287.8; [citation].)' " (*Moore*, *supra*, 248 Cal.App.4th at p. 245, quoting *Rope*, *supra,* 220 Cal.App.4th at pp. 652-653, italics added by *Moore*.)

The Legislature amended section 12940 in 2015 by adding two new subdivisions: (*l*)(4) and (m)(2). Subdivision (m)(2) is relevant to disability discrimination claims. (*Moore*, *supra*, 248 Cal.App.4th at p. 245.) In section 1 of Assembly Bill 987, the Legislature declared: "Notwithstanding any interpretation of this issue in *Rope* . . . , the Legislature intends (1) to make clear that a request for reasonable accommodation on the basis of . . . disability is a protected activity and (2) by enacting paragraph (2) of subdivision (m) and paragraph (4) of subdivision (*l*) of Section 12940, to provide protection against retaliation when an individual makes a request for reasonable

accommodation under these sections, regardless of whether the request was granted." (Stats. 2015, ch. 122, § 1, subd. (d).)

As for the retroactive application of the statute, the *Moore* court explained: " 'Generally, statutes operate prospectively only.' (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840.) Statutes operate prospectively unless they contain an express retroactivity provision, or it is ' "*very clear*" ' that the Legislature intended the statute to operate retroactively. (*Id.* at p. 841.) In this case, Assembly Bill 987 does not contain an express retroactivity provision, and there is nothing else that we have found that would make it very clear that the Legislature intended for the change it evidences to apply retroactively." (*Moore*, *supra*, 248 Cal.App.4th at p. 246.)

The *Moore* court explained: "However, ' "[a] statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment" "because the true meaning of the statute remains the same." ' (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471.) Courts, not the Legislature, determine whether a statute is 'merely' clarifying, rather than changing existing law. [Citation.] Thus, when the Supreme Court has 'finally and definitively' interpreted a statute, the Legislature is without power to state that a later amendment is simply declarative of existing law if the declaration of that existing law is contrary to the Supreme Court's interpretation. (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922.) However, if the Supreme Court has not provided a final and definitive interpretation of the relevant statute at the time the Legislature states that a later amendment is declarative of existing law, then courts interpreting the statute must give the Legislature's views consideration. (*Ibid.*)" (*Moore*, *supra*, 248 Cal.App.4th at p. 246.)

The *Moore* court stated, " 'A court engaged in statutory construction looks to "all pertinent circumstances and considerations in deciding whether an amendment is a

69

modification or clarification of a statute." [Citation.] And particularly when there is no definitive "clarifying" expression by the Legislature in the amendments themselves, we will presume that a substantial or material statutory change . . . bespeaks legislative intention to change, and not just clarify, the law.' [Citation.] By this standard, the preamble to the amendments contained in Assembly Bill 987, as well as the amendments themselves, are insufficient to show a legislative intent to clarify, as opposed to change, the law. There is no statement in the legislation that the Legislature was simply 'clarifying' what conduct constitutes 'protected activity' for purposes of the retaliation provision in subdivision (h) of section 12940. In addition, the Legislature's preamble to the amendment suggests that the change is intended to apply prospectively, by stating that despite the opinion in *Rope*, the Legislature 'intends . . . to provide protection against retaliation when an individual makes a request for reasonable accommodation under [section 13940, subdivisions (*l*) and (m)], regardless of whether the request was granted' by its enactment of the two new paragraphs. (Assem. Bill 987, § 1, subd. (d).) There would be no need to provide protection against retaliation by enacting additional provisions if the Legislature believed that such protection had always been provided under the law as it stood prior to the amendment. Further, the Legislature made no change to subdivision (h), the retaliation provision, itself. Rather, the Legislature chose to add new language to the subdivisions addressing accommodations for disabilities . . . . (See § 12940, subds. (*l*) & (m).)" (*Moore*, *supra*, 248 Cal.App.4th at pp. 246-247.) The court held that in passing Assembly Bill 987, the Legislature intended to *change* the law, not clarify it, and that the 2015 amendment of section 12940 therefore operates prospectively. (*Moore,* at p. 247.)

The court in *Cornell* followed *Moore*. It also addressed the import of the statement in section 1 of the bill that the Legislature "intend[ed] . . . to make clear that a request for reasonable accommodation on the basis of . . . disability is a protected

70

activity" (Stats. 2015, ch. 122, § 1, subd. (d)), which the trial court relied on in its analysis. The *Cornell* court stated: "We do not consider the use of the word 'clear' in this context to be a ' "definitive 'clarifying' expression by the Legislature," ' however, especially because in the next breath the Legislature said it intended to 'provide' protection against retaliation. [Citation.] In light of the other circumstances *Moore* identified as suggesting that the amendment changed the law, we agree that section 12940, subdivision (m)(2) does not apply to acts occurring before the amendment took effect." (*Cornell*, *supra*, 18 Cal.App.5th at pp. 943-944.)

Although SIS discusses *Moore* and *Cornell* in its respondent's brief, Zamora does not mention either case in either of his briefs, much less provide us with any reason not to follow them. Zamora's opening brief cites *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at page 990 for the proposition that requesting a disability accommodation was a protected activity when he was discharged. But the *Nadaf-Rahrov* court did not address this question. The court "assume[d] for purposes of argument that [the plaintiff] established her prima facie case" of retaliation and proceeded to the second step of the *McDonnell Douglas* framework. (*Ibid.*) " ' "[A]n opinion is not authority for a proposition not therein considered." ' " (*Palmer v. GTE California, Inc*. (2003) 30 Cal.4th 1265, 1278.)

Zamora's reliance on *Coons v. Secretary of the U.S. Dept. of Treasury* (2004) 383 F.3d 879 is misplaced for the same reason. *Coons* was a retaliation claim under the federal Rehabilitation Act (29 U.S.C. § 701 et seq.). The court stated, without any citation to authority or discussion, that the employee "engaged in a protected activity when he requested that [his employer] make reasonable accommodations for his alleged disability" and proceeded to analyze a different element of his prima facie case. (*Coons,* at p. 887.) *Coons* did not address the retroactive application of section 12940, subdivision (m)(2).

71

We agree with *Moore* and *Cornell* and conclude that the addition of subdivision (m)(2) to section 12940 in 2015 is prospective in application. When the alleged retaliation occurred in 2011, the law was consistent with the holding of *Rope*. "In other words, at the time of the relevant events, a request for an accommodation, without more, was insufficient to constitute 'protected activity' under section 12940, subdivision (h), and such activity thus could not support a claim for retaliation." (*Moore*, *supra*, 248 Cal.App.4th at p. 247, citing *Rope*, *supra*, 220 Cal.App.4th at p. 652.) Since as a matter of law, Zamora cannot establish that he engaged in a protected activity when he requested time off for his knee injury and other reasonable accommodations, he cannot demonstrate the first element of his prima facie case of retaliation. We therefore conclude that the trial court did not err when it granted summary adjudication of the retaliation claim.

### I. Conclusions

In summary, the trial court erred in granting summary adjudication of Zamora's disability discrimination, FEHA-based wrongful termination, and common law wrongful termination claims (Zamora's first, fifth, and sixth causes of action). The trial court did not err in summarily adjudicating Zamora's fourth cause of action for retaliation under the FEHA.

### DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings. The trial court is ordered to vacate its order on the motion for summary judgment, or, in the alternative summary adjudication, and to enter a new order (1) granting summary adjudication of the retaliation, wrongful termination based on Labor Code section 132a, and defamation claims (the fourth, seventh, and eight causes of action); (2) denying summary adjudication of Zamora's disability discrimination, failure to accommodate, failure to engage in a good faith interactive process, FEHA-based

72

wrongful termination, and common law wrongful termination claims (the first, second, third, fifth, and sixth causes of action); and (3) denying the motion for summary judgment.  The parties shall bear their own costs on appeal.

_____
Greenwood, P. J.

WE CONCUR:


_____
Elia, J.


_____
Grover, J.


Zamora v. Security Industry Specialists
No. H044008

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID ZAMORA, | H044008 |
| | (Santa Clara County |
| Plaintiff and Appellant, | Super. Ct. No. 12CV233674) |
| | |
| v. | |
| | |
| SECURITY INDUSTRY SPECIALISTS, INC., | |
| | |
| Defendant and Respondent. | |

BY THE COURT:

The request by appellant David Zamora for publication of the opinion filed in the above-entitled action on September 30, 2021, is granted.

_____

Greenwood, P. J.

_____

Elia, J.

_____

Grover, J.

The written opinion which, was filed on September 30, 2021, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is therefore ordered that the opinion be published in the official reports.

Dated: _____                    _____

Greenwood, P. J.